**COREGIS INSURANCE COMPANY,**
Defendant–Appellant,

v.

**AMERICAN HEALTH FOUNDATION, INC., AHF/Connecticut Management, Inc., AHF/Hartford, Inc., AHF/Windsor, Inc., AHF/Home Office, Inc., John M. Haemmerle, William Baxter, Thomas Dybick, Plaintiffs–Appellees.**

Docket No. 99–9300.

United States Court of Appeals,
Second Circuit.

Argued: July 13, 2000.

Decided: Feb. 14, 2001.

Jeffrey A. Goldwater, Bollinger, Ruberry & Garvey, Chicago, IL (Bryan G. Schumann, Daniel V. Marsalli, Bollinger, Ruberry & Garvey, Chicago, IL, of counsel, Christopher L. Brigham, Updike, Kelly & Spellacy, P.C., New Haven, CT), for defendant-appellant.

F. Timothy McNamara, Hartford, CT, for plaintiffs-appellees.

Before: WALKER, Chief Judge,[1] POOLER, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Defendant-appellant Coregis Insurance Company ("Coregis") appeals from a judgment of the United States District Court for the District of Connecticut (Peter C. Dorsey, *Senior Judge*) granting summary judgment to plaintiffs and denying summary judgment to defendants on the sole disputed issue of Coregis' right to disclaim coverage under plaintiffs' non-profit organization liability insurance policy (the "Policy") pursuant to the Policy's "insolvency exclusion." Plaintiffs AHF/Hartford, Inc. and AHF/Windsor, Inc. are non-profit companies that operate, manage and administer nursing homes in Connecticut (the "Companies"). The Companies and certain of their directors, officers, and affiliates brought this action seeking to have Coregis defend and indemnify them in connection with two lawsuits charging that plaintiffs failed to repay certain loans allegedly obtained through fraudulent misrepresentations about the financial health of the Companies (the "Lawsuits"). Because we find that a claim for coverage for the Lawsuits is a claim "[a]rising out of, based upon or related to" the "insolvency" or "financial impairment" of the Companies within the meaning of the policy exclusion at issue, we reverse the district court's order and judgment and remand with instructions to enter summary judgment in favor of Coregis.

## BACKGROUND

### A. *The Lawsuits*

The Lawsuits both allege that, in January 1992, the Companies received the proceeds of health care facilities revenue bonds issued by the Connecticut Development Authority pursuant to certain loan agreements.[2] In 1994, the Companies applied to the State of Connecticut Health and Educational Facilities Authority ("CHEFA") to refinance these loans. CHEFA refinanced the loans by, among other things, issuing new bonds (the "CHEFA Loan"). The Lawsuits claim that the Companies' applications to refinance the loans contained certain financial misrepresentations, discussed more fully below, upon which CHEFA relied to its detriment in making the CHEFA Loan.

In or before 1997, the Companies are alleged to have begun experiencing "severe financial problems," resulting in a cash flow that "was insufficient to service the debt on the CHEFA loan." On or about May 8, 1997, upon the motion of the State of Connecticut Commissioner of Public Health, the Connecticut Superior Court ordered the appointment of a receiver for AHF/Hartford pursuant to a Connecticut statute providing for such appointment

---

1. The Honorable John M. Walker was elevated to the position of Chief Judge subsequent to oral argument in this case.

2. The two complaints allege essentially the same facts, often using identical language.

where a nursing home "has sustained a serious financial loss or failure which jeopardizes the health, safety and welfare of the patients or there is a reasonable likelihood of such loss or failure." Conn.Gen. Stat. § 19a–543(3). The court subsequently appointed that receiver and on July 22, 1997, issued a similar order appointing the same individual as receiver for AHF/Windsor.

The Lawsuits were filed on December 5, 1997, alleging that plaintiffs supplied false information in the Companies' CHEFA Loan applications and falsely warranted in associated documents that such information was accurate. One lawsuit was brought by CHEFA (the "CHEFA Action") against all plaintiffs and the other by the receiver appointed for the Companies, E. Cortright Phillips, against all plaintiffs except the Companies (the "Receiver Action").

The complaints in both actions allege that, in connection with the Companies' CHEFA Loan application, the Companies hired a certified public accounting firm "to compile forecasted financial statements for the five years ending December 31, 1994 through December 31, 1998 for the AHF/Hartford and AHF/Windsor nursing homes and to issue a forecast report." The accounting firm prepared this forecast report allegedly relying on representation letters from the Companies and their officers that purported to demonstrate the Companies' "ability to meet operating expenses and to service the debt owed to CHEFA" (the "Representation Letters"). The Representation Letters provided data on "(i) rental income; (ii) operating expenses; (iii) occupancy rates; and [sic] (iv) patient income; and (v) patient mix" and a five-year projection of taxable income, cash flow from operations, and other information.

The Lawsuits charge that plaintiffs "knew or should have known that the information provided by them to the accounting firm and to CHEFA with regard to the projected operating results of the [Companies'] nursing homes lacked any reasonable factual basis." The complaints further allege that at the December 6, 1994 closing for the CHEFA Loan transaction, plaintiffs provided CHEFA with unaudited financial results for the AHF/Hartford nursing homes that showed $2 million more in revenue than the audited results released seven months later. The scope of the Companies' financial problems was allegedly revealed in full, however, when the Companies' nursing homes subsequently "suffered virtual financial failure" and never performed "in accordance with the representations provided by the defendants to CHEFA."

Based on the above, the CHEFA Action asserts claims of negligence against all plaintiffs, breach of contract against the Companies for violating the warranties of accuracy in the loan agreements they signed in 1994, and deceptive business acts and practices against all plaintiffs. In the Receiver Action, the receiver, standing in the shoes of the Companies, alleges negligence, breach of duty of care, and unfair or deceptive business acts against the Companies' officers, directors, and affiliates, claiming that "[b]ut for the ... misrepresentations, [the Companies] would not have committed themselves to the debt restructure which was executed on December 6, 1994, but would have instead pursued alternative means of restructure which means would not have led [the Companies] to sustain the current financial loss or failure."

### B. The Policy and the Insolvency Exclusion

Coregis issued the Policy effective January 1, 1997 insuring all plaintiffs. After the Lawsuits were filed, plaintiffs claim that they forwarded copies of the complaints to Coregis requesting that Coregis defend and indemnify them. By letter dated December 23, 1997, Coregis' law firm rejected their request, stating that "[t]he CHEFA Action and the receiver's action are barred from coverage by the

Insolvency Exclusion.... Additionally, the insolvency exclusion precludes coverage for any claim made by or on behalf of any federal, state or local governmental agency or office."

The Policy's insolvency exclusion (the "Provision") states:

### INSOLVENCY EXCLUSION

In consideration of the premium charged, it is further understood and agreed that the Insurer shall not incur any obligation under the terms and conditions of this policy for, or on account of, any claim:

1. Arising out of, based upon or related to:

 A. The insolvency of the company named in the Declarations;

 B. A financial impairment of the company named in the Declarations; or

 C. Any action, ruling or intervention of any federal, state or local governmental agency or office;

2. Made by, or on behalf of, any federal, state or local governmental agency or office.

The Policy does not define the terms "arising out of," "based upon," or "related to."

### C. The District Court's Ruling

Plaintiffs filed this action against Coregis on June 15, 1998 seeking a declaratory judgment of coverage. Subsequently, both sides moved for summary judgment on what they agreed was the sole dispositive issue—the interpretation of the Provision. Coregis claimed, *inter alia*, that the Lawsuits would not have been brought but for

the insolvency of the Companies, and that consequently the Lawsuits arise out of, are based upon, or are related to the insolvency and/or financial impairment of the Companies within the meaning of Clauses 1(A) or 1(B) of the Provision.[3] Plaintiffs contended that, because the claims against them were based on alleged misrepresentations made prior to the occurrence of the Companies' financial failure, such claims could have been brought whether or not the Companies became insolvent and thus did not come within the scope of the Provision.

By order entered on September 21, 1999, the district court agreed with the plaintiffs, granted their motion, and denied defendant's motion. The court held that the Provision did not exclude coverage for the Lawsuits, whether interpreted under Connecticut or Ohio law,[4] because

> the clause concerns claims arising directly from, or based on pending actions premised upon, plaintiffs' insolvency. The claims alleged against plaintiffs were viable whether or not plaintiffs encountered financial difficulties. Though AHF/Hartford's and AHF/Windsor's receiverships prompted the complaints, the claims alleged are not claims for insolvency (such as the failure to pay an outstanding debt because of bankruptcy), nor do they arise from insolvency nor are they the result of state action.
>
> . . .
>
> ... Although plaintiffs' financial condition may have triggered the making of the claims and the lawsuits arguably to be defended, the suits arise not from the plaintiffs' insolvency nor the commis-

---

3. Coregis also argued that the claims made by CHEFA and the receiver were excludable pursuant to other portions of the Provision dealing specifically with governmental agencies or offices. Because we find that coverage for the Lawsuits is excluded by the Provision pursuant to either Clause 1(A) or 1(B), we need not reach the issue of whether the governmental exclusions in Clauses 1(C) or 2 would provide an independent basis for excluding coverage.

4. The district court held that there was no relevant difference between the law of the two jurisdictions, thereby avoiding the need to address plaintiffs' argument that Ohio law, rather than Connecticut law, governed the interpretation of the Policy. As discussed *infra*, we agree with that finding.

sioner's actions, but from plaintiffs' conduct which gave rise to the financial plight and their misrepresentations related thereto.

Coregis appeals from the district court's judgment.

## DISCUSSION

### A. *Standard of Review and Applicable Law*

We review a district court's grant or denial of summary judgment *de novo*. *See Henry E. & Nancy Horton Bartels Trust v. United States*, 209 F.3d 147, 149 (2d Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 426, 148 L.Ed.2d 435 (2000).

 Because we agree with the district court that Connecticut and Ohio law do not differ in any respect relevant to this case, we similarly find no need to resolve the potential choice of law issue regarding the law applicable to the interpretation of the Policy. Under the law of both states, if the language of an insurance policy is not otherwise defined by the policy, but is clear on its face, the court must give effect to the reasonable and natural interpretation of such language. *See Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583, 573 A.2d 699, 704 (Conn.1990) (holding that, in interpreting an exclusion from coverage, "[i]f the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning" (internal quotation marks omitted)); *Watkins v. Brown*, 97 Ohio App.3d 160, 164, 646 N.E.2d 485, 487 (Ohio Ct.App. 1994) ("Contract terms are to be given their natural and usual meaning if they are not defined in the policy. . . . [I]f an exclusionary clause has only one reasonable interpretation, a court is bound to enforce the provision accordingly." (internal quotation marks and citations omitted)). Any

ambiguities in an insurance contract are construed against the insurer. *See Heyman Assocs. No. 1 v. Insurance Co.*, 231 Conn. 756, 770, 653 A.2d 122, 130 (Conn. 1995) ("[W]hen the words of an insurance contract are, without violence, susceptible of two [equally responsible] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. [T]his rule of construction favorable to the insured extends to exclusion clauses." (internal quotation marks and citations omitted) (second and third alterations in original)); *Watkins*, 97 Ohio App.3d at 164, 646 N.E.2d at 487 ("[W]here policy language is ambiguous, that language is to be construed in the way that is most favorable to the insured. This general principle applies with even greater force to language that purports to limit or to qualify coverage." (internal citations omitted)). Finally, the law of both states provides that an insurer's duty to defend is measured solely by whether the complaints against the insured allege facts that, if proven true, would present a claim within the scope of the policy's coverage.[5] *See Springdale Donuts, Inc. v. Aetna Cas. and Sur. Co.*, 247 Conn. 801, 807, 724 A.2d 1117, 1120 (Conn.1999) ("[I]t is well settled that an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying] complaint." (internal quotation marks omitted) (second alteration in original)); *Cincinnati Indem. Co. v. Martin*, 85 Ohio St.3d 604, 605, 710 N.E.2d 677, 678 (Ohio 1999) ("A liability insurer's obligation to its insured arises only if the claim falls within the scope of coverage. The insurer need not provide a defense if there is no set of facts alleged in the complaint which, if proven true, would invoke coverage.").

### B. *Interpretation of the Provision*

 As set forth in the district court's ruling, Coregis argued below that "al-

---

**5.** It is for this reason that the facts relevant to the motions for summary judgment at issue here are simply the Policy and the allegations made against plaintiffs in the Lawsuits.

though the charges [in the Lawsuits] sound in contract and tort, they substantively relate to insolvency, as they would not have been brought under any other circumstances," and further argued that the fraudulent behavior at issue "assured [the Companies'] financial failure." Although the district court agreed that "[a]s alleged, plaintiffs' behavior caused the financial failure which resulted in the appointment of a receiver," it nevertheless held that both the CHEFA Action and the Receiver Action were not excluded from coverage under the Policy. The court concluded that while "AHF/Hartford's and AHF/Windsor's receiverships prompted the complaints, the claims alleged are not claims for insolvency (such as the failure to pay an outstanding debt because of bankruptcy), *nor do they arise from insolvency*," and that "[a]lthough plaintiffs' financial condition may have triggered the making of the claims and the lawsuits arguably to be defended, *the suits arise not from the plaintiffs' insolvency nor the commissioner's actions,* but from plaintiffs' conduct which gave rise to the financial plight and their misrepresentations related thereto." (Emphasis added).

■ The district court's holding that the Lawsuits did not "arise" from insolvency, even if correct, does not fully dispose of the coverage issue, however, because the Provision excludes not only claims "arising out of" the insolvency or financial impairment of the Companies, but also claims "related to" such a situation. Both Connecticut and Ohio law instruct us not to interpret words or provisions in an insurance policy as mere surplusage if, under a reasonable interpretation of such words, they may be given independent meaning. *See A.M. Larson Co. v. Lawlor Ins. Agency,* 153 Conn. 618, 622, 220 A.2d 32, 34 (Conn.1966) ("Every provision [of a contract of insurance] is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be

given to it." (internal quotation marks omitted) (alteration in original)); *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.,* 16 F.3d 684, 686 (6th Cir.1994) ("Under Ohio substantive law, the courts construe insurance contracts in accordance with the same rules as other written contracts.... In construing a contract, a court ... must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage." (internal citations omitted)). Here, the ordinary meaning of the term "related to" as used in the Provision is broader than the term "arising out of," and, giving effect to this independent meaning of "related to," the Provision excludes coverage for the Lawsuits.

To "arise" out of means "to originate from a specified source." Webster's Third New International Dictionary 117 (1986); *see also* Black's Law Dictionary 102 (7th ed.1999) (defining "arise" as "1. To originate; to stem (from) ... 2. To result (from)"). The phrase "arising out of" is usually interpreted as "indicat[ing] a causal connection." *American States Ins. Co. v. Guillermin,* 108 Ohio App.3d 547, 560, 671 N.E.2d 317, 325 (Ohio Ct.App.1996); *see also Holy Trinity Church v. Aetna Cas. & Sur. Co.,* 214 Conn. 216, 223 n. 5, 571 A.2d 107, 112 n. 5 (Conn.1990) (finding that the phrase "arising out of" in an insurance policy exclusion "signifies that a causal relationship between the injury and the excluded activity, as defined therein, removes the injury from the ambit of the policy's coverage").

The term "related to" is typically defined more broadly and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation." Webster's Third New International Dictionary, *supra,* at 1916. The word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to,' " is defined as a "connection" to or a "reference" to. *Id.* at 1916. Courts have similarly described the term

"relating to" as equivalent to the phrases "in connection with" and "associated with," *see Jackson v. Lajaunie*, 270 So.2d 859, 864 (La.1972), and synonymous with the phrases "with respect to," and "with reference to," *see Phoenix Leasing, Inc. v. Sure Broad., Inc.*, 843 F.Supp. 1379, 1388 (D.Nev.1994), *aff'd*, 89 F.3d 846 (9th Cir. 1996), and have held such phrases to be broader in scope than the term "arising out of." *See Jackson*, 270 So.2d at 864 (" 'In connection with' is a broader term than 'arising out of the use of the premises for the purposes' of a service station.... This [injury] was linked to the station, associated with the station, related to the station, and, in the absence of a new and restrictive definition of an old and well understood word, connected with the station." (internal citations and footnote omitted)); *cf. Cameron Mut. Ins. Co. v. Skidmore*, 633 S.W.2d 752, 753 (Mo.Ct.App. 1982) ("It appears to us that 'in connection with' [any premises] has a broader meaning than 'arising out of any premises.' ").

■ We find that, regardless of whether coverage for the Lawsuits would constitute a claim "arising out of" the Companies' insolvency or financial impairment, the ordinary meaning of the broad term "related to" as used in the Provision is clear and unambiguous in its application to exclude such coverage.[6] Thus, the rules of interpretation discussed above requiring ambiguities to be construed in favor of the insured are not implicated. We note that the fact that a term is broad in scope does not necessarily make it ambiguous. *Accord, Peerless Ins. Co. v. Gonzalez*, No. CV 950553119S, 1996 WL 521163, at *3–*5 (Conn.Super.Ct. Sept.4, 1996) (holding liability insurance policy's "lead exclusion," which excluded coverage for "[b]odily [i]njury ... arising in whole or in part out of the ... use or existence of, exposure to, or contact with lead," was "clear, unambiguous and broad in its sweep" and excluded

claims involving injury from lead-paint exposure), *aff'd*, 241 Conn. 476, 483, 697 A.2d 680, 683 (Conn.1997) ("[T]here is no requirement that a policy exclusion be cast in specific, rather than general, terms.... The relevant inquiry is ... whether the language of the exclusionary provision nevertheless clearly and unambiguously applies to lead paint."); *Watkins*, 97 Ohio App.3d at 160–66, 646 N.E.2d at 486–89 (reversing district court's finding that "business exclusion" in homeowner's policy—excluding claims "arising out of any activities of any insured in connection with a business owned or controlled by any insured"—was "overly broad" and thus ineffective to exclude coverage, and holding that an exclusion need not expressly list a particular scenario in order to unambiguously apply to that scenario). Nor is a finding of ambiguity appropriate, even assuming that a broad term might be ambiguous with respect to its application to a hypothetical set of facts, where, as here, the plain meaning of the phrase unambiguously includes the actual situation for which coverage is sought.

The Lawsuits are unquestionably "connected to," "associated with," and brought "with reference to" the insolvency or financial impairment of the Companies, and thus plaintiffs' request for coverage for the Lawsuits is "related to" such financial failure. The complaints both allege, *inter alia*, that plaintiffs never performed "in accordance with the representations provided by [them] to CHEFA" because the Companies' nursing homes "suffered virtual financial failure" after the CHEFA Loan was made. While plaintiffs are correct that the Lawsuits premise liability on fraudulent misrepresentations plaintiffs allegedly made prior to such financial failure, it remains the case that the Companies' financial failure is the injury for which damages are sought in the Receiver Action and is the cause of CHEFA's prin-

6. We therefore need not decide whether a provision excluding only claims "arising out of" or "based upon" the insolvency or financial impairment of the insured companies would encompass the claims made here.

cipal injury, the Companies' failure to repay the CHEFA Loan, in the CHEFA Action.[7] Moreover, the alleged misrepresentations were themselves related to the Companies' insolvency or financial impairment, despite being made prior to that event, because they were alleged to be statements about the Companies' financial condition that were intended to hide the fact that financial failure was looming on the horizon.

Other courts have interpreted broad insolvency exclusions in the same manner. In *Lexington Ins. Co. v. American Healthcare Providers*, 621 N.E.2d 332 (Ind.Ct. App.1993), for example, the officers and directors of a health management organization ("HMO") sought insurance coverage for a lawsuit alleging that the HMO's directors and officers had "breached their fiduciary duties to [the company] by failing to take appropriate action to preserve and protect the assets of [the company] then in existence after the defendants knew or should have known of the deteriorating financial condition of [the company]." *Id.* at 336–37 (internal quotation marks omitted). The insurance policy at issue excluded:

> Claims based upon, arising out of, due to or involving directly or indirectly the insolvency, receivership, bankruptcy, liquidation or financial inability to pay of any Insured, any Insurer or any other person, including Claims brought by any insurer guarantee or insolvency fund or any receiver or liquidator of any insurer

or any Commissioner or Superintendent of Insurance.

*Id.* at 335. The Indiana Court of Appeals held that the lawsuit's allegation that the actions of the officers and directors contributed to the financial downfall of the company demonstrated that the lawsuit "unquestionably involved the insolvency and liquidation of another person." *Id.* at 336. The court explained: "Since acts which 'lead to' or 'cause' an insolvency or liquidation also 'involve' an insolvency or liquidation, giving those terms their plain and ordinary meanings, claims based on those acts would be excluded...." *Id.* at 337; *see also McCuen v. International Ins. Co.*, No. 87–54–D–1, 1988 WL 242680, at *5–*6 (S.D.Iowa Sept.29, 1988) (finding that where insurance policy excluded coverage for claims "[a]rising out of, based upon or related to ... the insolvency or any financial impairment of the [company]," insurance company properly disclaimed coverage for lawsuit alleging that insolvent bank's officers and directors "had been negligent ... and had committed mismanagement in handling certain loans that had resulted in financial loss and instability of [the bank]." )[8]

Similarly, when insurance brokers have sought coverage under "errors and omissions" liability policies for claims involving the wrongful placement of a customer's insurance with an insurer that subsequently became insolvent, most courts have held that insolvency exclusions in such policies apply despite the fact that liability for such

---

7. Because we conclude that the Provision by its terms excludes coverage for the Lawsuits, we need not reach the potentially serious questions raised by Coregis concerning whether the Policy's limit of coverage to "LOSS which the INSUREDS shall be legally obligated to pay ... due to a WRONGFUL ACT," Policy, § 1, would limit or make unavailable coverage for a lawsuit, such as the CHEFA Action, that appears primarily to seek repayment of moneys that the Companies were contractually obligated to pay even absent any "wrongful act." *See generally American Cas. Co. v. Hotel & Rest. Employees & Bartenders Int'l Union Welfare Fund,* 113 Nev. 764, 942 P.2d 172 (Nev.1997).

8. We note that one federal district court has stated in *dicta* that a similar policy provision excluding claims "arising out of, based upon or related to" the "insolvency" or "financial impairment" of the insured companies was ambiguous because the terms of the provision were too broad. *See International Ins. Co. v. McMullan,* No. J84–0760(W), 1990 WL 483731, at *19–*20 (S.D.Miss. Mar. 7, 1990). As we have already noted, we disagree with the premise that the broad scope of a provision renders it ambiguous, particularly when no ambiguity exists regarding its application to the actual scenario at issue.

claims is premised on mistakes made prior to the insolvency by persons independent of the insolvent entity. In *Barron v. Scaife,* 535 So.2d 830 (La.Ct.App.1988), for example, the court held that there was no coverage because

> [t]he clear and unambiguous language of the policy specifically excludes claims "arising from" or "related to" the insolvency of any insurance company. *The claim that [the broker] intentionally failed to inform its insured of the insolvency of [the insurance company] by its very wording is related to the insolvency of the insurance company,* as without the insolvency of [the insurance company], there would be no claim.

*Id.* at 832–33 (emphasis added). Here as well, the Lawsuits are related to the Companies' financial failure by the very wording of the complaints, which explicitly refer to, discuss, and seek redress· for that failure. *See also Transamerica Ins. Co. v. South,* 975 F.2d 321, 328 (7th Cir. 1992) (finding no coverage for negligent misrepresentation claims under provision excluding claims "arising out of insolvency, receivership or bankruptcy of any organization (directly or indirectly) in which the INSURED has placed or obtained coverage"); *Transamerica Ins. Co. v. Snell,* 627 So.2d 1275, 1276–77 (Fla.Dist. Ct.App.1993) (although acknowledging that broker's negligence and breach of contract may have been cause of customer's loss, holding that there was no coverage under exclusion using same language as the policy in *Transamerica Ins. Co. v. South*); *Kleneic v. White Lake Marine Corp.,* 144 A.D.2d 341, 342–43, 533

N.Y.S.2d 909, 910–11 (2d Dep't 1988) (per curiam) (finding no coverage for indemnification and negligence claims under provision excluding claims "arising out of or in connection with the financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurer," although estopping insurer from disclaiming coverage on other grounds).[9]

## CONCLUSION

We conclude that, as a matter of law, coverage for the Lawsuits is clearly and unambiguously excluded by the Provision. Accordingly, we reverse the district court's grant of summary judgment to plaintiffs and remand with instructions to enter summary judgment in favor of Coregis.

---

**9.** ˙Where a provision excludes only claims "resulting from" or that "result from" the inability of an insurance company to pay its debts, courts have reached differing conclusions. *Compare St. Paul Fire & Marine Ins. Co. v. Cohen–Walker, Inc.,* 171 Ga.App. 542, 543–45, 320 S.E.2d 385, 387–88 (Ga.Ct.App.1984) (finding exclusion applied even though "complaint sounds in tort for the negligence of [the broker] in failing to adequately investigate the insurance company" because broker's customer "would have no right of recovery against [the broker] if the recommended insurance company had been financially able to pay his claim.") *with St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.,* 870 S.W.2d 223, 226 (Ky.1994) (holding that since purpose of policy by its terms was to cover errors, omissions and negligent acts of broker, exclusion was ambiguous as applied to situations in which loss resulted both from broker error and insurer's inability to pay claims—and thus would be interpreted against the insurer and in favor of coverage).