**2021 UT App 116**

# THE UTAH COURT OF APPEALS

WILLOW CREEK ASSOCIATES OF GRANTSVILLE LLC,
Appellant,
*v.*
HY BARR INCORPORATED AND HYRUM BARLOW,
Appellees.

Opinion
No. 20200260-CA
Filed November 4, 2021

Third District Court, Tooele Department
The Honorable Matthew Bates
No. 190300674

Rick N. Haderlie and Christopher W. Eckels,
Attorneys for Appellant

Adam C. Dunn and Michael C. Dunn, Attorneys
for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1      Willow Creek Associates hired Hy Barr Incorporated to remodel some apartments. The parties' contract included a mandatory arbitration agreement that required them to arbitrate all claims "arising out of or related to" the contract.

¶2      After Willow Creek and Hy Barr had a falling out over some payments to subcontractors, Willow Creek made a claim against Hy Barr and Hyrum Barlow (Hy Barr's president) and submitted that claim to arbitration. But when Willow Creek later made other claims against Hy Barr and Barlow, it did so through a lawsuit. The district court dismissed those claims for failure to

first submit them to arbitration as required by the contract. Willow Creek now appeals that dismissal. We affirm.

BACKGROUND[1]

*The Contract*

¶3 Willow Creek owns an apartment complex. Hy Barr is a corporation that specializes in apartment renovations, and Hyrum Barlow is the president and owner of Hy Barr.

¶4 In 2017, Willow Creek and Hy Barr entered into a contract under which Hy Barr would remodel Willow Creek's apartment complex (the Project). Willow Creek and Hy Barr agreed that this contract "represent[ed] the entire and integrated agreement between the parties."

¶5 The contract identified Willow Creek as the "Owner" and Hy Barr as the "Contractor." It defined "Contractor" to include "the Contractor's authorized representative." And Hyrum Barlow was identified in the contract as the "Contractor's representative."

¶6 The contract also set forth the process by which the parties were required to resolve their "claims and disputes." It defined "claim" as "a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief

---

1. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Haynes v. Department of Public Safety*, 2020 UT App 19, n.2, 460 P.3d 565 (quotation simplified).

with respect to the terms of the Contract." "Claim" "also include[d] other disputes and matters in question between the Owner and the Contractor *arising out of or relating to* the Contract." (Emphasis added.)[2]

¶7     Under the contract, a claim by Willow Creek or Hy Barr had to "be initiated by written notice to the other party and to the Initial Decision Maker." The contract identified the Initial Decision Maker as the "Architect," an architectural firm associated with the Project. Within ten days of receiving a claim, the Initial Decision Maker was required to approve or reject the claim. The Initial Decision Maker was also empowered to inform the parties that it was "unable to resolve the Claim" if the Initial Decision Maker thought it would be "inappropriate" to do so.

¶8     A decision by the Initial Decision Maker was "final and binding on the parties but [could be] subject to mediation." Claims that were "subject to, but not resolved by, mediation [were] subject to arbitration." Within thirty days of an initial decision, the contract allowed a party to demand that the other party request mediation. If that demand was made and the party who received the demand did not then request mediation, "both parties waive[d] their right to mediate or pursue binding dispute resolution proceedings with respect to the initial decision."[3]

---

2. As noted, this provision required the parties to arbitrate claims that were "arising out of or relating to" the contract. For stylistic clarity, this opinion will sometimes refer to claims that "arose out of or related to" the contract without noting the alteration in tense.

3. As evidenced by our discussion below, this dispute-resolution process later proved critical in the ensuing litigation. Although this process called for three steps—submission to the Initial

(continued…)

*The Initial Decision*

¶9    In the contract, the parties agreed that Willow Creek would transfer money to Hy Barr, which Hy Barr would then use to pay subcontractors.

¶10    In 2019, a subcontractor filed suit against Willow Creek and Hy Barr after it did not receive payment for materials that it furnished to Hy Barr for the Project.[4] In response to the subcontractor's suit, Willow Creek sent a letter to the Initial Decision Maker and to Barlow. This letter demanded that "Contractor Hy Barr, Inc." pay $648,734.78 to Willow Creek so that Willow Creek could pay the subcontractors.[5] The Initial Decision Maker later agreed that "the Contractor, Hy Barr, Inc." needed to pay Willow Creek $648,734.78 (hereinafter "the Initial Decision").

*The Cross-claim*

¶11    After the Initial Decision, Willow Creek timely demanded that Barlow and Hy Barr request mediation. When neither did,

---

(…continued)
Decision Maker, followed by mediation, followed by arbitration—we will sometimes refer to it globally as an "arbitration agreement," though we will at other times refer to the individual steps individually when doing so is more appropriate for a particular portion of our analysis.

4. Various organizations associated with the Project were also included as defendants. The district court later dismissed the claims against those parties.

5. This amount included, among others, costs to pay subcontractors, liquidated damages, and interest.

Willow Creek filed a cross-claim in district court against them in the action brought by the subcontractor.

¶12     In this cross-claim, Willow Creek raised twelve causes of action. All twelve were made against Barlow personally and against Hy Barr. The first cause of action, titled "Confirmation of Initial Decision" (the Initial Decision Claim), was based on the claim that Willow Creek had previously submitted to the Initial Decision Maker. In that cause of action, Willow Creek alleged that it was entitled to a court order "confirming the Initial Decision and entering judgment in the amount of $648,734.78 against Contractor." Unlike the Initial Decision Claim, however, the additional eleven causes of action had not been submitted to the Initial Decision Maker.[6]

*The Motion to Dismiss*

¶13     Barlow and Hy Barr filed a joint motion to dismiss Willow Creek's cross-claim. With respect to the first cause of action—the Initial Decision Claim—Hy Barr agreed that Willow Creek "should be awarded a judgment against Hy Barr, Inc. as outlined by the" Initial Decision. By contrast, Barlow argued that this cause of action did not apply to him personally because "the Initial Decision Maker determined that *only* Hy Barr, Inc. owed money to" Willow Creek. (Emphasis in original.)

---

6. These additional causes of action were entitled: "Breach of Contract," "Bad Faith Breach of Contract," "Accounts Stated," "Negligence," "Intentional Misrepresentation," "Negligent Misrepresentation," "Unjust Enrichment," "Violation of U.C.A. § 76-10-1603," "U.C.A. § 25-6-202 to Void Fraudulent Conveyance," "Alter Ego," and "Declaratory Relief per U.C.A. 78B-6-401, *et seq.*"

¶14 With respect to the remaining eleven causes of action, Hy Barr and Barlow jointly asked the court to dismiss them because Willow Creek had not first submitted them to the Initial Decision Maker as required by the contract.

¶15 In response to this motion to dismiss, Willow Creek argued that its cross-claim raised "claims that [were] not within and [were] completely outside of the contract." Willow Creek further argued that the Initial Decision Maker "was to only approve or reject the initial contract issue. It was not to make comprehensive legal determinations under legal causes of action."

¶16 The district court held a hearing on the motion to dismiss. There, Hy Barr and Barlow argued that all claims other than the Initial Decision Claim against Hy Barr should be dismissed because Willow Creek had not submitted them to the Initial Decision Maker. Echoing this, the court asked Willow Creek why it had not taken its claims to the Initial Decision Maker— i.e., why it should "allow [Willow Creek] to bring claims in this court outside of that process?" Willow Creek responded that its letter to the Initial Decision Maker had put Hy Barr and Barlow on "notice" that Willow Creek would be pursuing other legal claims.

¶17 The district court granted the motion to dismiss with regard to some of the claims because it was convinced that they "should have been submitted to" the Initial Decision Maker.[7] But the court asked for supplemental briefing on whether the

---

7. Specifically, the court dismissed Willow Creek's claims for breach of contract, "Bad Faith Breach of Contract," "Accounts Stated," negligence, intentional misrepresentation, negligent misrepresentation, unjust enrichment, "Violation of U.C.A. § 76-10-1603," and "Declaratory Relief per U.C.A. 78B-6-401."

fraudulent-conveyance and alter-ego claims qualified as "other dispute[s] or matter[s] in question between the parties that arise[] out of or [are] related to the contract." The court also asked for supplemental briefing "on the extent to which Hyrum Barlow [could] be held responsible for his own tortious conduct."

¶18   In their supplemental briefing, Hy Barr and Barlow argued that the phrase "arising out of or relating to" should be interpreted broadly and that the phrase covered the fraudulent-conveyance and alter-ego claims. Barlow further argued that because he was included in the definition of "Contractor," claims against him personally were required to be submitted to the Initial Decision Maker.

¶19   Willow Creek responded that because Hy Barr and Barlow did not seek mediation or arbitration after the Initial Decision, Willow Creek could bring any claims so long as those claims were brought within "the time period specified by applicable law." Because Hy Barr had agreed that Willow Creek should be awarded a judgment against Hy Barr—but not Barlow—based on the Initial Decision, Willow Creek also asked for entry of judgment on the Initial Decision Claim against Hy Barr.

¶20   At a subsequent hearing, the court concluded that the claims against Barlow were "subject to the dispute resolution terms of the contract." This was because Barlow—the "authorized representative" of Hy Barr—was a "Contractor" under the contract. The court also concluded that the phrase "arising out of or relating to the contract" was "very broad language" that "includes, essentially, all of the claims" brought by Willow Creek. The court accordingly dismissed all claims against Hy Barr and Barlow that Willow Creek had not previously submitted to the Initial Decision Maker. The court

later entered a final judgment against Hy Barr for $648,734.78 based on the Initial Decision.[8]

*Willow Creek's Rule 60 Motion*

¶21 After the district court's decision, Willow Creek sent another letter to the Initial Decision Maker asking it to now consider all of the claims that had been dismissed by the district court. In response, Hy Barr sent a letter to the Initial Decision Maker requesting assurances that the Initial Decision did not apply against Barlow. Hy Barr also asked the Initial Decision Maker to determine that Willow Creek did not timely request a decision on the claims it brought in its letter.

¶22 Before the Initial Decision Maker responded to these letters, Willow Creek filed a notice of appeal challenging the district court's ruling on Hy Barr and Barlow's motion to dismiss.

¶23 After Willow Creek filed its notice of appeal, the Initial Decision Maker responded to the letters from Willow Creek and Hy Barr. The Initial Decision Maker declined to issue any decision for two reasons. First, the Initial Decision Maker noted that its "contract obligations [had] expired, including any obligations to serve as Initial Decision Maker." Second, the Initial Decision Maker expressed its view that it was "not qualified to decide the five legal issues" raised in Willow Creek's letter, "and in fairness cannot respond to" Hy Barr and Barlow's "requests either."

¶24 Willow Creek then filed a rule 60 motion in the district court asking for relief from the court's earlier order dismissing

---

8. Neither party appealed the district court's conclusion that the Initial Decision applied only against Hy Barr.

its claims. *See* Utah R. Civ. P. 60 (allowing parties to file for "[r]elief from judgment or order"). Willow Creek argued that the Initial Decision Maker's refusal to decide Willow Creek's claims qualified as "newly discovered evidence" that justified relief. Willow Creek also argued for the first time that it was entitled to relief because arbitration agreements are "unenforceable where a plaintiff has been defrauded."

¶25　The district court denied Willow Creek's motion in January 2021. Willow Creek did not file a new or amended notice of appeal after the denial of that motion.

ISSUE AND STANDARD OF REVIEW

¶26　On appeal, Willow Creek argues that the district court erred in dismissing its claims against Hy Barr and Barlow. A district court's "grant or denial of a motion to dismiss is a question of law" that we review for correctness. *South Jordan City v. Summerhays*, 2017 UT App 18, ¶ 5, 392 P.3d 855 (quotation simplified). We do "not defer in any degree" to the district court's "determination of law." *Id.* (quotation simplified).

ANALYSIS

¶27　In its brief, Willow Creek acknowledges that it "does not dispute" that the contract included an arbitration agreement. Rather, Willow Creek contends that its claims "against Hy Barr and Mr. Barlow are outside the contract and therefore not subject to" the arbitration agreement. In the alternative, Willow Creek argues that it was "inconsistent with substantial justice" to require Willow Creek to take its claims to an Initial Decision Maker who "declined to address the claims." Willow Creek further argues that an arbitration agreement is "unenforceable" when a plaintiff alleges fraud.

¶28     First, we reject Willow Creek's argument that its claims were "outside the contract." Because Willow Creek's claims "arose out of or related to" the contract, Willow Creek needed to submit them to the Initial Decision Maker. And because Willow Creek did not do so, the district court correctly dismissed those claims.

¶29     Second, we cannot consider Willow Creek's arguments regarding the Initial Decision Maker's refusal to hear the claims or the applicability of arbitration agreements to fraud claims. Willow Creek's claim in this regard arose after the notice of appeal was filed, but it never filed a new or amended notice of appeal. As a result, we do not have appellate jurisdiction to consider these arguments.

### I. Willow Creek's Claims "Arose Out of or Related to" the Contract[9]

¶30     As noted, Willow Creek and Hy Barr agreed in their contract that all claims "arising out of or relating to the Contract" must be presented to the Initial Decision Maker. After Willow Creek later filed twelve claims against Hy Barr and Barlow in district court, the court concluded that all of the claims "arose out of or related to" the contract and dismissed the claims that Willow Creek had not first submitted to the Initial Decision Maker.

¶31     On appeal, Willow Creek maintains that its claims "arise outside the scope of the contract and are therefore not subject to" the arbitration agreement. We hold that the phrase "arising out of or relating to" should be interpreted broadly and that Willow

---

9. Willow Creek makes similar arguments about this language with respect to its claims against Hy Barr and Barlow. Our resolution applies to both.

Creek's claims "arose out of or related to" the contract. As such, Willow Creek should have first submitted them to the Initial Decision Maker. Because it did not, the district court correctly dismissed them.

¶32    If parties have "an agreement to arbitrate" and one party refuses to arbitrate, "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate." Utah Code Ann. § 78B-11-108(1)(b) (LexisNexis 2017).

¶33    This directive reflects Utah's "strong public policy in favor of arbitration." *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 358 (Utah 1992). Utah courts have repeatedly recognized that it "is the policy of the law in Utah to interpret contracts in favor of arbitration." *Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 16, 40 P.3d 599 (quotation simplified); *see also Reed v. Davis County School Dist.*, 892 P.2d 1063, 1065 (Utah 1995) (stating that it "is the policy of the law in Utah to interpret contracts in favor of arbitration"); *Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 479 (Utah 1986) (noting Utah's "policy of encouraging extrajudicial resolution of disputes when the parties have agreed not to litigate").

¶34    Before enforcing an arbitration agreement, we must resolve two questions.

¶35    First, we must decide if there is an "enforceable agreement to arbitrate." Utah Code Ann. § 78B-11-108(1)(b). When doing so, we remain cognizant of Utah's "strong public policy in favor of arbitration." *Chandler*, 833 P.2d at 358. But, ultimately, "the intentions of the parties are controlling." *Central Fla. Invs.*, 2002 UT 3, ¶ 12. "[W]e first look to the plain language within the four corners of the agreement to determine the intentions of the parties." *Id.* And "[i]f the language within the

four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.*

¶36    Second, we must determine "which claims the parties intended to be subject to arbitration." *Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 18, 217 P.3d 716. On this question too, we recognize a preference for arbitration—i.e., "we encourage arbitration by liberal interpretation of the arbitration provisions themselves." *Cade v. Zions First Nat'l Bank*, 956 P.2d 1073, 1077 (Utah Ct. App. 1998) (quotation simplified).

¶37    Here, we readily conclude that there was an enforceable arbitration agreement. Indeed, Willow Creek has conceded as much, stating that it "does not dispute that the parties' agreement contains an agreed upon [dispute-resolution] process."

¶38    We also conclude that this arbitration agreement applied to claims against Barlow in his personal capacity. Under the contract, "claims" "include[d] other disputes and matters in question between the Owner and Contractor." The contract primarily defined the term "Contractor" as "Hy Barr, Inc.," but it also stipulated that the term "Contractor" included "the Contractor's authorized representative." The contract then identified "Hyrum Barlow" as the "Contractor's representative."

¶39    In its brief, Willow Creek notably "does not dispute" that Barlow qualified as a Contractor. Thus, because it stands undisputed that Barlow was a "Contractor" under this contract, Willow Creek was contractually required to first raise any claims it had against him to the Initial Decision Maker.

¶40    Because Willow Creek concedes that there was an enforceable arbitration agreement, and because that agreement

applied to the claims made against both Hy Barr and Barlow, the remaining question is whether Willow Creek's claims fell within the scope of that agreement. We conclude that they did.

¶41    "When we interpret a contract," we start with its plain language. *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Central Fla. Invs.*, 2002 UT 3, ¶ 12. And in "many cases, we need look no further than the plain language of the contract, because that language may unambiguously tell us what the parties intended." *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 22, 474 P.3d 481.

¶42    Our analysis is guided by "the ordinary and usual meaning of the words." *South Ridge Homeowners' Ass'n v. Brown*, 2010 UT App 23, ¶ 1, 226 P.3d 758 (quotation simplified); *see also Pugh v. Stockdale & Co.*, 570 P.2d 1027, 1029 (Utah 1977); *Berman v. Berman*, 749 P.2d 1271, 1273 (Utah Ct. App. 1988). And when assessing such meaning, we often look to "standard, non-legal dictionaries." *Warburton v. Virginia Beach Fed. Sav. & Loan Ass'n*, 899 P.2d 779, 782 (Utah Ct. App. 1995).

¶43    Here, we start—and ultimately end—with the plain language of the arbitration agreement. Willow Creek and Hy Barr agreed that claims between them would go first to an Initial Decision Maker. They further agreed that "claims" included disputes "arising out of or relating to" the contract.

¶44    "Arising out of" means to "spring up, come into existence or notice." Oxford English Dictionary online, "arise" (definition 18a). And the verb "arise" describes something that "originate[s] from a source." *Arise*, Merriam-Webster online, (definition 1b), https://www.merriam-

webster.com/dictionary/arise [https://perma.cc/REE5-9ES2]. "Arise" also means to "stem" or "result" from something. *Arise*, Black's Law Dictionary (11th ed. 2019).

¶45 The phrase "related to" more generally describes things that have "some connection with" each other. Oxford English Dictionary online, "relate" (definition 6a). Put differently, "relate to" is used "to connect (something) with (something else)." *Relate to*, Merriam-Webster online, (definition 1), https://www.merriam-webster.com/dictionary/relate%20to [https://perma.cc/GY9V-GK4V]. Something is "related" when it is "[c]onnected in some way" or has a "relationship to or with" the other thing. *Related*, Black's Law Dictionary (11th ed. 2019).

¶46 When used together, the phrase "relating to" broadens the reach of "arising out of." *See Coregis Ins. v. American Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (explaining that "'related to' is typically defined more broadly" than "arising out of"). In this sense, a claim "need only have some logical or causal connection to the agreement to be related to it." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 524 (3d Cir. 2019) (quotation simplified).

¶47 Given these principles, courts have commonly given broad interpretations to provisions like the one at issue here. The United States Supreme Court, for example, held that an arbitration agreement that covered claims "arising out of or relating to" a contract was "easily broad enough to encompass" fraudulent-inducement claims. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967). And the Eighth Circuit held that an arbitration agreement that applied to claims "arising out of or relating to" an agreement was "the broadest language the parties could reasonably use to subject their disputes to [arbitration], including collateral disputes that relate to the agreement containing the clause." *Fleet Tire Service of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 620–21 (8th Cir.

1997). Other courts have held similarly. *See, e.g., JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004); *Polyflow, L.L.C. v. Specialty RTP, L.L.C*, 993 F.3d 295, 303–04 (5th Cir. 2021); *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1034 (7th Cir. 2012); *Newmont U.S.A. Ltd. v. Insurance Co. of N. Am.*, 615 F.3d 1268, 1274–75, 1275 n.5 (10th Cir. 2010).

¶48     Applied here, "arising out of or relating to" is broad enough to cover Willow Creek's claims. Willow Creek's cross-claim included general allegations, several of which alleged that Hy Barr and Barlow "failed" to do certain things "as required by the Contract." Willow Creek alleged, for example, that Hy Barr and Barlow "failed to pay subcontractors and suppliers," "failed to provide bonds," and failed to "complete the Project"—all "as required by contract." Willow Creek's generalized reference to the fact that such claims stemmed from the "contract" demonstrates that those claims were subject to the contract's arbitration agreement.

¶49     So too with the more specific language included in the claims themselves. For example, Willow Creek complained of Hy Barr and Barlow's failures to "pay subcontractors" and "perform their work in competent, workmanlike manners." But in the contract, the parties agreed that the Contractor would pay subcontractors: "The Contractor shall pay each Subcontractor no later than seven days after receipt of payment from [Willow Creek]." The parties also agreed that the Contractor would "require each Subcontractor to make payments to Sub-subcontractors in a similar manner." And as explained above, "Contractor" included both Hy Barr and Barlow. The claims against Hy Barr and Barlow were therefore directly linked to specific contractual provisions.

¶50     Willow Creek also complained of Hy Barr and Barlow's failure to "perform their work in competent, workmanlike manners." But in the contract, the parties detailed the necessary

renovations and agreed that the "Contractor" "shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." The contract also stated that the "Contractor" would ensure that the "materials and equipment" would be "of good quality" and that the work would be "free from defects." And the contract further required the "Contractor" to comply with "laws, statutes, ordinances, codes, rules and regulations." Because the contract explained what work Hy Barr and Barlow were required to do and how they were required to do it, Willow Creek's claims that Hy Barr and Barlow "failed to perform their work in competent, workmanlike manners" originate from the contract.

¶51    In short, Willow Creek's claims either directly stemmed from the contract or at least had "some logical or causal connection" to it. *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d at 524. Given the broad interpretation that we give to the arbitration provision, we readily conclude that these claims "arose out of or related to" the contract. As a result, Willow Creek was required to submit them to the Initial Decision Maker. Because it failed to do so, the district court correctly dismissed those claims.[10]

---

10. Willow Creek also argues that the arbitration agreement should be deemed unenforceable because it is "unfair" to make Willow Creek submit claims to someone who lacks "legal expertise." But to properly preserve an issue for appeal, an "issue must be specifically raised" to the district court and "supported by evidence and relevant legal authority." *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839. While Willow Creek made passing reference to this argument below, it did not support this reference with developed argument that was based on "relevant legal authority." *Id.* This argument is accordingly

(continued…)

## II. This Court Lacks Appellate Jurisdiction to Consider the Arguments Willow Creek Raised in Its Rule 60 Motion

¶52 Willow Creek next argues that, even if its claims were required to go to the Initial Decision Maker, this court should still consider those claims because not doing so would be "unfairly prejudicial to Willow Creek's ability to obtain substantial justice." In Willow Creek's view, this is so because the Initial Decision Maker "declined to address the claims" and

---

(…continued)

unpreserved. And because Willow Creek does not assert in its appellate brief that this argument is subject to a preservation exception, it fails. *See State v. Johnson*, 2017 UT 76, ¶¶ 14–17, 416 P.3d 443.

In any event, the parties anticipated that the Initial Decision Maker might not be able to resolve all potential claims. This is presumably why they included a provision in the contract that allowed the Initial Decision Maker to "advise the parties" that it was "unable to resolve [a] Claim" if "it would be inappropriate for the Initial Decision Maker" to do so. But even with this recognition, the parties still also agreed that all claims "arising out of or relating to" the contract must first go to the Initial Decision Maker—which is the very thing that would allow the Initial Decision Maker to decide, for example, that it would be unable to resolve any particular claim.

While Willow Creek now apparently regards this agreed-upon sequencing to be imprudent, this is not a basis for us to undo the contract. *See Ted R. Brown & Assocs., Inc. v. Carnes Corp.*, 753 P.2d 964, 970 (Utah Ct. App. 1988) ("[A] court may not make a better contract for the parties than they have made for themselves . . . ."). As a result, these claims were subject to the arbitration agreement. And for the reasons explained above, Willow Creek's failure to first submit them to arbitration was grounds for the district court to dismiss them.

because arbitration agreements (allegedly) cannot apply to fraud claims. We cannot address these arguments, however, because Willow Creek raised them for the first time below after the notice of appeal was filed and yet never filed an amended notice of appeal. Moreover, Willow Creek has not presented us with any reason to review them as unpreserved grounds for overturning the district court's ruling.

¶53　In the briefing and arguments on the motion to dismiss, Willow Creek argued that its claims were "completely outside the contract," that the arbitration agreement could not "replace[] the legislature's statutes of limitations," and that the Initial Decision had given Hy Barr and Barlow "timely notice of Willow Creek's claims." But Willow Creek never argued that the Initial Decision Maker had refused to consider its claims or that arbitration agreements cannot apply to fraud claims. Instead, it raised those arguments for the first time in a rule 60 motion, which was *after* it had filed a notice of appeal from the earlier order dismissing its claims.[11]

¶54　Rule 60 allows a court to "relieve a party" from an order under certain circumstances. Utah R. Civ. P. 60(b). But when a party files a notice of appeal before the court enters an order disposing of a rule 60 motion, the notice of appeal "is effective to appeal only from the underlying judgment." Utah R. App. P. 4(b)(2). If the party wants the appellate court to also consider the district court's disposition of the rule 60 motion, the "party must file a notice of appeal or an amended notice of appeal within the

---

11. Indeed, Willow Creek could not have challenged the Initial Decision Maker's refusal to hear these claims in its notice of appeal, because the Initial Decision Maker had not made that decision yet. This is likely why Willow Creek argued that the Initial Decision Maker's decision was "newly discovered evidence" that justified relief from the district court's order.

prescribed time." *Id.* If there is no new or amended notice of appeal filed after the denial of the rule 60 motion, "an appellate court lacks jurisdiction to consider issues raised" in the rule 60 motion. *Li-Huang Pon v. Brewer*, 2020 UT App 99, ¶ 7, 468 P.3d 581; *see also Dole v. Dole*, 2018 UT App 195, ¶ 40, 437 P.3d 464 (noting that a party's failure to amend a notice of appeal after entry of judgment on a post-trial motion deprives a court of "jurisdiction to consider" its "arguments related to [a] post-trial motion").

¶55　Again, Willow Creek did not raise these issues until its rule 60 motion, which was filed and ruled on after the notice of appeal, but Willow Creek did not file an amended notice of appeal after that ruling. As a result, we "lack jurisdiction to consider" those arguments now. *See Dole*, 2018 UT App 195, ¶ 40.[12]

---

12. In theory, Willow Creek could have argued that the district court committed plain error by not recognizing, in its initial dismissal of the claims, that fraud claims are not subject to arbitration agreements. But Willow Creek did not make that plain error argument in its brief, so it is not before us now. *See State v. Peterson*, 881 P.2d 965, 968 (Utah Ct. App. 1994) (refusing to consider an issue raised "for the first time on appeal" when the party did not argue plain error).

In any event, plain error occurs only when the error "should have been obvious to the district court," and to establish obviousness, the party "must show that the law governing the error was clear at the time the alleged error was made." *Veracity Networks LLC v. MCG S. LLC*, 2019 UT App 53, ¶ 27, 440 P.3d 906 (quotation simplified). This was not so here. Willow Creek points to *Energy Claims Ltd. v. Catalyst Inv. Group Ltd.*, 2014 UT 13, 325 P.3d 70. But in that case, the supreme court held that a "forum selection clause [is] unenforceable" when a party claims

(continued…)

CONCLUSION

¶56    Willow Creek's claims against Hy Barr and Barlow "arose out of or related to" the contract. Willow Creek was therefore contractually obligated to take those claims to the Initial Decision Maker. Because it did not, the district court correctly dismissed those claims. Moreover, because Willow Creek's additional arguments about the enforceability of the arbitration agreement are outside of this court's appellate jurisdiction, we cannot consider them. We accordingly affirm.

––––––––––––

(…continued)
that "the contract was *entered into* fraudulently." *Id.* ¶¶ 51–52 (emphasis added). Here, however, Willow Creek does not claim that its contract with Hy Barr was "entered into fraudulently." Rather, it complains only of fraud that it believes occurred during the parties' subsequent business dealings. Willow Creek points to no authority that obviously establishes that parties cannot agree to arbitrate any claims of fraud that arise from their subsequent business dealings.