2022 UT App 73

## THE UTAH COURT OF APPEALS

AIRSTAR CORPORATION,
Appellant,
*v.*
KEYSTONE AVIATION LLC AND SALT LAKE CITY CORPORATION,
Appellees.

Opinion
No. 20190847-CA
Filed June 16, 2022

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 160904929

David J. Jordan, Lauren DiFrancesco, and
Chaunceton Bird, Attorneys for Appellant

Jonathan O. Hafen, Daniel E. Barnett, and Austin J.
Riter, Attorneys for Appellee Keystone Aviation LLC

Catherine L. Brabson and David F. Mull, Attorneys
for Appellee Salt Lake City Corporation

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1　This appeal concerns a parcel of real property at the Salt Lake City International Airport that is used for private hangar space. Salt Lake City owns the property and leased it to Keystone Aviation LLC, and Keystone then subleased it to Airstar Corporation. Airstar's sublease included a clause under which the sublease would terminate if Keystone's lease with Salt Lake City "terminated for any reason."

¶2　In 2015, Keystone and Salt Lake City negotiated a premature termination of Keystone's lease. When this happened,

Airstar's sublease terminated too. Airstar later sued both Keystone and Salt Lake City, asserting several breach-of-contract-related claims. But the district court dismissed all of Airstar's claims, and it also awarded attorney fees to Keystone.

¶3      On appeal, Airstar challenges both the dismissal of its claims and the award of attorney fees. For the reasons set forth below, we affirm on both fronts.

BACKGROUND

*The Hudson Sublease and the 1992 FBO Agreement*

¶4      Salt Lake City leases real property located at the Salt Lake City International Airport to Fixed Base Operators (FBOs). An FBO is a person or entity that provides aircraft services like fuel sales, terminal services, and hangar space. FBOs provide these services to the general aviation industry, which is "the sector of aviation that includes all air operations other than military or commercial air carriers."

¶5      In 1986, Hudson General Corporation entered into an FBO agreement with Salt Lake City. As part of that agreement, Salt Lake City leased a parcel of land, commonly identified in the briefing and record as Hangar 16, to Hudson.

¶6      In October 1992, Hudson and Salt Lake City entered into a new FBO agreement (the 1992 FBO Agreement) that superseded their original FBO agreement and included additional terms and conditions. In the 1992 FBO Agreement, the parties included a provision that the parties have referred to on appeal as the Attornment Clause.[1] The Attornment Clause provided that,

---

1. "Attornment" refers to a "tenant's agreement to hold the land as the tenant of a new landlord." *Attornment*, Black's Law

(continued…)

[s]hould this Agreement be terminated for any reason, the City shall succeed to the interest of Tenant under any subleases covering all or any portion of the Leased Premises or the Facility, and shall be bound to each subtenant under such subtenant's sublease to the same extent as Tenant was bound as sublandlord, provided that such subtenant shall attorn to the City and agree to be bound to the City under the terms and conditions of such sublease as if the City were the sublandlord under such sublease. So long as any such subtenant is not in default under the terms of its sublease, such sublease shall remain in full force and effect, and such subtenant's interest and estate under its sublease shall not be disturbed because of a default by Tenant under this Agreement.

(Quotation simplified.)

¶7     Hudson later assigned the 1992 FBO Agreement to a different entity. In August 2011, that entity assigned the 1992 FBO Agreement to Keystone.

*The Hangar 16 Sublease*

¶8     In 1992, Hudson subleased Hangar 16 to Airstar Corporation (the Hudson Sublease). The Hudson Sublease terminated in 2012. In June 2012, after the 1992 FBO Agreement had been assigned to Keystone, Keystone and Airstar entered into

---

Dictionary (11th ed. 2019). Put differently, attornment occurs when "a person who holds a leasehold interest . . . agrees to become the tenant of a stranger who has acquired the fee in the land" and "acknowledges his obligation to a new landlord." *Consolidated Realty Group v. Sizzling Platter, Inc.*, 930 P.2d 268, 269 n.2 (Utah Ct. App. 1996) (quotation simplified).

a new sublease for Hangar 16 (the Hangar 16 Sublease).[2] The Hangar 16 Sublease had an "initial term" of "approximately nine (9) years," which meant that it would terminate in 2021. (Quotation simplified.)

¶9 The Hangar 16 Sublease contained three clauses that are relevant to this appeal: the Termination Clause, the Notice Clause, and the Attorney Fees Clause.

¶10 First, the Termination Clause stated that

> Airstar agrees that in the event that the FBO Agreement, or any other agreement or authority to do business at the Airport is terminated *for any reason* other than an exercise of powers of eminent domain (which shall be addressed in accordance with Paragraph 11 hereof) or a failure of Keystone to timely perform its obligations thereunder (which shall be addressed in accordance with the provisions of Paragraphs 16 and 17 thereof), and Keystone is required to give up possession of the Premises as a result, then this Lease *shall terminate* as of the date that Keystone is no longer permitted to occupy the Premises under such terminated agreement, without recourse or damages or compensation of any sort being demanded by Airstar . . . . Keystone shall give Airstar *as much notice as possible of any situation which may result in termination of the FBO Agreement* or any other

---

2. In their communications with each other and throughout the litigation, the parties sometimes referred to this Hangar 16 Sublease as "the Hangar 16 Lease," "the 2012 Hangar Lease," or "the Hangar Lease." To avoid numerous alterations when quoting the parties, we'll generally leave those cited references unchanged, with the understanding that they all refer to the 2012 sublease between Keystone and Airstar for Hangar 16.

underlying lease, agreement, or authority to do business at the Airport, including copies of all notices, communications and information available to Keystone regarding such pending or threatened termination.

(Emphases added.)

¶11    Second, the Notice Clause stated that

[a]ll notices and other communications (each a "notice") required or permitted to be given under this Lease shall be in writing and shall be either (a) personally delivered; (b) sent by certified mail, return receipt requested, postage prepaid; or (c) sent by Federal Express or other nationally recognized air courier, expenses prepaid, to the address set forth in the opening paragraph of this Lease for notice of the party to whom it is to be given. Notice shall be effective upon receipt by the party or upon refusal of delivery of the notice at the address provided herein for such party.

(Quotation simplified.)

¶12    And finally, the Attorney Fees Clause stated that,

[i]n the event of the bringing of any action or suit by either party hereto by reason of any breach of any of the covenants or agreements on the part of the other party arising out of this Lease, then in that event the prevailing party shall be entitled to have and recover of and from the other party costs and expenses of the action or suit, including reasonable attorneys' fees.

*Amendment 7*

¶13    In 2013, Salt Lake City hired a consulting firm to assess the feasibility of adding another FBO to the airport. Shortly after the consulting firm completed its study, Salt Lake City reached out to Keystone to talk about this possibility. In October 2014, Salt Lake City and Keystone negotiated an agreement that required Keystone to terminate its Hangar 16 lease before the lease term expired. In exchange, Salt Lake City agreed to extend the lease terms on other properties that Keystone leased at the airport. The parties referred to this as "the Lease Swap Agreement" or "the Lease Swap."

¶14    In February 2015, Salt Lake City and Keystone executed Amendment 7 to the 1992 FBO Agreement. This was done to facilitate the Lease Swap Agreement, and, in this amendment, they agreed that the 1992 FBO Agreement would "continue through March 31, 2016," and then terminate. This meant that the 1992 FBO Agreement would now end on March 31, 2016, rather than on May 31, 2021, as the parties had previously contracted.[3]

*Communications Between Keystone and Airstar*

¶15    Sometime in the summer of 2015, Airstar's chief pilot requested Keystone's permission for Airstar to resurface Hangar 16's floor.[4] Keystone gave its approval, and in June 2015, Airstar asked Keystone for permission to place a temporary storage container near the hangar while it resurfaced the floor. Keystone,

---

3. The 1992 FBO Agreement was amended six times between 1996 and 2008. In 1998, the parties agreed that the 1992 FBO Agreement would "continue for a period of twenty eight (28) years and eleven (11) months from July 1, 1992," which meant that the 1992 FBO Agreement would terminate on May 31, 2021.

4. The exact scope of the chief pilot's responsibilities is unclear from the record, but it appears that he had at least some administrative responsibilities.

in turn, asked Salt Lake City for permission, and Salt Lake City approved the request.

¶16    That same month, the Airport Business Development Manager for Salt Lake City emailed Keystone about the floor work, saying that it "seems like a rather large investment for [Airstar] to make given the remaining term of the agreement (9 months)." The Business Development Manager continued, "[We're] sure [Keystone is] doing everything [it] can to accommodate [Airstar] and their future needs, but given the investment they appear to be making, [we] want to make sure [Airstar is] aware of the limited amount of time they have in the building as [we're] sure they would like to have enough time to recover their costs."[5]

¶17    Keystone forwarded this email to Airstar's chief pilot, saying that it was "unsolicited" and that the airport was "just concerned with the limited Lease Term." The pilot responded,

> I am very concerned! This e-mail trail that [Airstar] started two weeks ago requesting permission to place a temp storage unit on the property to help facilitate the mentioned work, becomes the first document (after the work has started) that implies [Keystone] and or the SLC Airport do not intend to honor our signed lease contract that is valid for the next 7 years.

¶18    On February 8, 2016, Keystone sent a letter to Airstar's headquarters. That letter said,

> Pursuant to paragraph 18.2 of the referenced Lease, notice is hereby given that Keystone Aviation's FBO Agreement, as defined in the Lease, for [Hangar 16]

---

5. An Airstar representative later testified that although he didn't "specifically" know how much the resurfacing cost, he thought it probably ended up costing "somewhere in the low six figures."

> will terminate on March 31, 2016 per Amendment #7 (attached). As further provided in paragraph 18.2, Airstar and Keystone have agreed that in the event the FBO Agreement is terminated for any reason, then the Lease will also terminate.

The letter concluded by requesting that Airstar "surrender possession of the Premises on or before March 31, 2016."

¶19    In an emailed response, Airstar invoked the provision in the Termination Clause that required Keystone to give Airstar "as much notice as possible of any situation which may result in termination of the FBO Agreement . . . , including copies of all notices, communications and information available to Keystone regarding such pending or threatened termination." Airstar asserted that it had not previously corresponded with Keystone about the lease termination. Airstar also asked if Keystone had "comparable hangars available for lease to [Airstar], with terms comparable or better than what was in place for [Hangar 16]."

¶20    In an emailed reply, Keystone claimed that it had communicated with Airstar's chief pilot in November 2014 and January 2015 to talk about the lease termination and "future hangar options." Keystone also claimed that during the second meeting, the chief pilot "indicated" that "Airstar would stay in Hangar 16 and see how this turns out."[6]

*The Atlantic Aviation Sublease*

¶21    After receiving the February 2016 letter, Airstar met with Salt Lake City about the soon-to-be terminated sublease. At that meeting, Salt Lake City "told Airstar that [Hangar 16] had already

---

6. Keystone later deposed the chief pilot and asked him, "When was the first time anyone at Keystone told you they planned to terminate the Hangar 16 lease early?" The chief pilot answered that he did not know about the early termination until Keystone sent the February 2016 letter.

been leased to the new FBO, Atlantic Aviation." Salt Lake City also "told Airstar that it would need to negotiate a sublease with Atlantic if it wished to continue to lease the Hangar."

¶22 Around that time, Airstar began negotiating with both Atlantic Aviation and Keystone to acquire hangar space. Keystone showed Airstar alternative spaces that it had available, but Airstar decided not to lease any of them because they were "substandard and more expensive" and some of the potential hangars had not yet been built. Airstar ultimately decided to continue subleasing Hangar 16 from Atlantic Aviation rather than moving to a different hangar. But under its new sublease, Airstar paid "substantially higher rent and fuel costs than it was paying under the 2012 Sublease" with Keystone.

*Airstar's First Complaint*

¶23 After entering into the new sublease with Atlantic Aviation, Airstar filed a complaint against Keystone. Airstar's complaint pleaded several causes of action. As later recognized by the district court, the causes of action collectively and essentially "asserted two separate bases for relief." First—in what we'll refer to as the Premature Termination Claims—Airstar alleged that when Keystone agreed to Amendment 7, it "breached the Hangar Lease" and the implied covenant of good faith and fair dealing "by voluntarily shortening the term of the FBO Agreement." Second—in what we'll refer to as the Notice Claims—Airstar alleged "that Keystone breached both the Hangar Lease and the implied covenant in failing to timely inform Airstar of the Lease Swap negotiations." For these alleged breaches, Airstar asked for over $1 million in damages.

¶24 After filing an answer and a counterclaim, Keystone moved for judgment on the pleadings. There, Keystone asked for relief in the form of a declaration that "the 2012 Hangar Lease terminated because the FBO Agreement terminated 'for any reason'" and that "as a result of termination of the 2012 Hangar Lease, neither Keystone nor Airstar has any further rights,

obligations, or causes of action under the [2012] Hangar Lease." Keystone also argued that it was "irrelevant" whether the 1992 FBO Agreement was voluntarily terminated because "[a]ll that matters is whether the [1992] FBO Agreement 'terminated for any reason.'"[7]

*Dismissal of Premature Termination Claims*

¶25 The district court later issued a decision partially granting Keystone's motion for judgment on the pleadings. There, the court ruled that Keystone did not breach the Hangar 16 Sublease by voluntarily and prematurely terminating the 1992 FBO Agreement. The court based this ruling on the plain language of the Hangar 16 Sublease, which provided that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement "terminated *for any reason*." (Emphasis in original.) The court noted that this provision of the Hangar 16 Sublease included two exceptions— "eminent domain or a failure of Keystone to timely perform its obligations under the FBO Agreements." From this, the court concluded that the exclusion of voluntary termination from the listed exceptions "necessarily implie[d]" that premature termination counted as "any reason." And the court ascertained nothing in the Hangar 16 Sublease that prohibited Keystone from agreeing to a premature termination. The court accordingly decided that Keystone was "entitled to judgment on the face of the pleadings themselves with regard to Airstar's claims for breach of contract and breach of the implied covenant of good faith and fair dealing insofar as those claims are based on the premature termination of the Hangar Lease." But the court

---

7. Keystone also filed a third-party complaint against Atlantic Aviation, asserting that if the Hangar 16 Sublease had not terminated, then the 1992 FBO Agreement's Attornment Clause "provides that [Salt Lake City], and therefore Atlantic, is subject to the terms of the 2012 Hangar Lease." The court later dismissed this claim because it concluded that the Hangar 16 Sublease had been properly terminated.

determined that Airstar's Notice Claims were "sufficiently pled" and allowed those claims to proceed.

*Airstar Attempts to Attorn*

¶26    In February 2017 (shortly after Keystone filed its motion for judgment on the pleadings), Airstar sent a letter to Salt Lake City. In that letter, Airstar noted that, in its prior pleadings, Keystone had taken the position that if the Hangar 16 Sublease had not terminated, Airstar's only available remedy was to attorn to Salt Lake City. *See supra* note 7. Airstar continued by stating that "[t]o put any question of the matter to rest," it was "informing [Salt Lake City] that Airstar agrees to attorn to [Salt Lake City] and be bound to [Salt Lake City] under the terms and conditions of the Hangar Lease."

¶27    In response, Salt Lake City informed Airstar that in its view, the Attornment Clause of the 1992 FBO Agreement had not been "triggered" and that, even if it had been, the Hangar 16 Sublease terminated along with the 1992 FBO Agreement. Salt Lake City concluded by stating that "Airstar's request to attorn [was] not accepted."

*Airstar's Amended Complaint*

¶28    After the court dismissed Airstar's Premature Termination Claims, Airstar filed an amended complaint. In that complaint, Airstar reasserted the Notice Claims—i.e., it again alleged that Keystone breached both the Hangar 16 Sublease and the implied covenant of good faith and fair dealing by giving insufficient notice of its "communications and negotiations with the SLC Airport regarding the Lease Swap and possible early termination of the Hangar 16 Lease."

¶29    In the amended complaint, Airstar also added Salt Lake City as a defendant. In conjunction with this addition, Airstar alleged that, as a subtenant, it was a third-party beneficiary of the 1992 FBO Agreement. Airstar further asserted that because it was

a third-party beneficiary, Keystone and Salt Lake City owed it certain obligations and that they breached those obligations "by modifying the [1992] FBO Agreement and entering into the Seventh Amendment without Airstar's consent." Airstar also alleged that Salt Lake City "breached its obligations to Airstar" as a third-party beneficiary "by failing to give Airstar an opportunity to attorn to [Salt Lake City] prior to re-leasing [Hangar 16] to Atlantic Aviation."

¶30 The amended complaint also asserted that "Airstar negotiated a sublease with Atlantic to continue leasing Hangar 16, but at a substantially higher rent and higher fuel costs." Thus, the basis for Airstar's claimed damages for the Notice Claims was the cost of resurfacing the hangar floors, the higher rent and fuel costs, and other costs associated with attempting to mitigate damages.

*Dismissal of Third-Party Beneficiary Claims*

¶31 Keystone moved for partial judgment on the pleadings, asking the court to dismiss the causes of action that were based on third-party beneficiary rights. Keystone contended that "Airstar waived any right it had as a third party beneficiary under the [1992] FBO Agreement" when it "expressly agreed that the sublease would automatically terminate if the [1992] FBO Agreement terminated for any reason."

¶32 Salt Lake City also moved for a dismissal of Airstar's third-party beneficiary claims. Like Keystone, Salt Lake City argued that Airstar waived any third-party rights by agreeing to the Hangar 16 Sublease.

¶33 The district court issued a written order dismissing the third-party beneficiary claims. It first determined that Airstar "was an intended third party beneficiary . . . of the [1992] FBO Agreement" based on that agreement's "unambiguous reference . . . to the rights of sublessees or subtenants." But the court then determined that, under the terms of the Hangar 16 Sublease,

"Airstar accepted that its sublease would terminate as of the date of termination of the [1992] FBO Agreement for any reason other than an exercise of power of eminent domain or a failure of Keystone to timely perform its obligations under the FBO Agreement." And the court further determined that this was an "unambiguous written waiver . . . of Airstar's third party beneficiary rights under the [1992] FBO Agreement," which "preclude[d] Airstar's reliance on its third party beneficiary status to pursue its breach of contract claim." The court thus granted Keystone's motion for judgment on the pleadings and Salt Lake City's motion to dismiss Airstar's claims for third-party beneficiary breach of contract and breach of the implied covenant.

*Dismissal of Notice Claims*

¶34    At this point, the only claims that remained were Airstar's Notice Claims. The parties conducted discovery on those claims as the case progressed, including deposing various witnesses.

¶35    Of note, Salt Lake City designated its Director of Administration and Commercial Services at the Salt Lake City Department of Airports (the Administration Director) as its rule 30(b)(6) designee, and Airstar later deposed him.[8] In his deposition, the Administration Director stated that if Salt Lake City had known "that the Airstar lease had a term continuing until 2021," Salt Lake City's "approach" to its negotiations with Keystone "would likely have led to . . . making certain that Keystone" made "accommodations" for Airstar. But the Administration Director also said that he didn't know whether Salt Lake City would have suggested a "specific accommodation"

---

8. Under rule 30(b)(6) of the Utah Rules of Civil Procedure, "[a] party may name as the witness a corporation, a partnership, an association, or a governmental agency, describe with reasonable particularity the matters on which questioning is requested, and direct the organization to designate one or more officers, directors, managing agents, or other persons to testify on its behalf."

and that he thought Salt Lake City's approach would "likely" have led to Keystone making "whatever accommodations, whether financial accommodations or other space accommodations or some other accommodations, with any other tenants that have prevailing terms that went beyond."[9]

¶36   Keystone also deposed the person who had been the Director of the Salt Lake City Department of Airports during the Lease Swap (the Airport Director). The Airport Director testified that "[w]ith respect to negotiations between the airport and FBOs," she did not "believe that the airport should have concerned itself, in those negotiations, with the terms of subleases."

¶37   After discovery concluded, and after the dismissals described above, the parties filed competing motions for summary judgment on the Notice Claims. In its motion, Airstar relied on the plain language of the Hangar 16 Sublease, wherein the parties agreed that "Keystone shall give Airstar as much notice as possible of any situation which may result in termination of the FBO Agreement." Airstar claimed that it was undisputed that by February 2015 (when Salt Lake City and Keystone executed Amendment 7), Keystone was "aware" that the 1992 FBO Agreement was going to terminate prematurely. Airstar also claimed that it was undisputed that "Keystone did not provide the required notice of the impending termination until February 2016." Airstar accordingly asked for summary judgment on the Notice Claims.

¶38   In its competing motion, Keystone did "not dispute" for purposes of summary judgment "Airstar's allegations that Keystone breached the notice provisions . . . of the 2012 Hangar Sublease by giving Airstar insufficient notice of the Lease Swap negotiation." But Keystone nevertheless argued that Airstar had not shown "that Keystone's alleged breach of the sublease's notice

---

9. Additional detail regarding the Administration Director's testimony is provided below in Part III.

provisions . . . proximately caused Airstar's purported damage." In Keystone's view, Airstar's alleged damages consisted of three components:

1.  "the difference in rent and fuel margin between the 2012 Hangar Sublease and the Atlantic Sublease";

2.  "the alleged cost of resurfacing the floors of the leased airplane hangar"; and

3.  "the alleged cost of mitigating Airstar's damages resulting from the termination of the 2012 Hangar Sublease, including Airstar's attorney fees."

Keystone then argued that "there is no record evidence that any of these alleged damages [were] caused by purported untimely notice by Keystone." In other words, Keystone argued that Airstar had not "identified any alternatives to the Atlantic Sublease that would have been available if Keystone had provided Airstar with timely notice under the 2012 Hangar Sublease."

¶39    The district court issued a written decision granting Keystone's motion for summary judgment and denying Airstar's. The court began by acknowledging that "generally, proximate cause is determined by an examination of the facts, and questions of fact are to be decided by the jury." (Quotation simplified.) But the court then noted that "proximate cause issues can be decided as a matter of law when the proximate cause of damages is left to speculation so that the claims fail as a matter of law." (Quotation simplified.)

¶40    Here, the court determined that Airstar's "sole support for the causation element of its claims for breach of contract and breach of the implied covenant" was the Administration Director's deposition testimony. But the court concluded that his testimony was speculative and did not establish causation for purposes of damages. When coupled with the Airport Director's testimony that ran contrary to Airstar's claims on this, the court

determined that the evidence "unambiguously provide[d] that the City would not have concerned itself with the negotiation of rental rates between" Airstar and Keystone. The court thus determined that Airstar "failed to present any non-speculative evidence in support of its assertion that, had [Airstar] been apprised of the lease swap negotiations at an earlier date, [Airstar] could have ensured that the rent and associated costs of renting the hangar space would not increase." This left no "genuine issue of material fact regarding an essential element" of Airstar's Notice Claims, and the court granted Keystone's motion for summary judgment. By doing so, the court disposed of the only remaining claims.

*Award of Attorney Fees*

¶41   After the court dismissed Airstar's Notice Claims, Keystone filed a motion for attorney fees based on the Attorney Fees Clause in the Hangar 16 Sublease. In response, Airstar requested that Keystone's motion for attorney fees "be denied in its entirety." Airstar first argued that the amount of fees that Keystone had requested was unreasonable. But more importantly for purposes of this appeal, Airstar also argued that Keystone "failed to allocate its attorney fees or costs between the distinct claims or parties in this case" as required by *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, 94 P.3d 193. Specifically, Airstar argued that work associated with the third-party beneficiary claims was noncompensable because those claims were based on the 1992 FBO Agreement, which does not have an attorney fees clause. And although it conceded that the Hangar 16 Sublease included an attorney fees clause, Airstar contended that work associated with claims based on the Hangar 16 Sublease should not be compensable "[b]ecause Keystone failed to allocate its requested costs and expenses among the claims or parties."

¶42   In a written decision, the court determined that the Attorney Fees Clause in the Hangar 16 Sublease "unambiguously establishes the prevailing party in this action may recover attorney fees and costs incurred in litigating a claim relating to the

Hangar Lease." The court also concluded that Keystone was the prevailing party and that Keystone had requested reasonable attorney fees.

¶43 The court next rejected Airstar's claim that Keystone's failure to allocate its fees among compensable and noncompensable claims meant that it was not entitled to attorney fees. Although the court acknowledged that a party must typically allocate fees, it concluded that where legal work performed in litigating a compensable claim is "inextricably intertwined with the legal work associated with" a noncompensable claim, the fees related to the noncompensable claim are "appropriately included in the fee calculation." (Quotation simplified.) Applying that principle, the court determined that "the noncompensable claims—those related to Salt Lake City Corporation, Atlantic Aviation and the [1992] FBO Agreement—are inextricably intertwined with the compensable claims asserted in this action—those related to the Hangar Lease." The court then concluded that "each of the issues for which Keystone would not have been entitled to an award of attorney fees related directly to Airstar's claim for breach of the Hangar Lease."

¶44 The court accordingly denied "Airstar's request to reduce Keystone's overall fee award by the amounts attributable to [those] claims." It did, however, limit Keystone's recovery to costs "incurred during litigation," meaning Keystone could not recover pre-litigation attorney fees.

¶45 After the court's ruling on the attorney fees issue, Airstar timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶46 Airstar raises four issues on appeal.

¶47 First, Airstar argues that the district court erred in dismissing its Premature Termination Claims. We "review[] a

decision on a motion for judgment on the pleadings de novo, giving no deference to the district court's analysis." *Latham v. Office of Recovery Services*, 2019 UT 51, ¶ 17, 448 P.3d 1241.

¶48    Second, Airstar argues that the court "erred in ruling that Airstar impliedly waived its attornment rights as a third-party beneficiary under the 1992 [FBO] Agreement by entering into the 2012 Hangar 16 Sublease." (Quotation simplified.) This ruling was part of the court's order granting Keystone's motion for judgment on the pleadings and Salt Lake City's motion to dismiss, so we review this decision de novo. *See id.*; *see also Van Leeuwen v. Bank of Am. NA*, 2016 UT App 212, ¶ 6, 387 P.3d 521.

¶49    Third, Airstar argues that the court erred in finding that "Airstar failed to present any non-speculative evidence in support of its breach of contract cause of action." When reviewing a district court's grant of summary judgment, we view "the facts and all reasonable inferences drawn therefrom . . . in the light most favorable to the nonmoving party, while the district court's legal conclusions and ultimate grant or denial of summary judgment are reviewed for correctness." *Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312 (quotation simplified).

¶50    Finally, Airstar argues that "the district court erred when it determined that non-compensable claims based on the [1992] FBO Agreement were inextricably intertwined with the compensable claims based on the Hangar 16 Sublease." Airstar asserts that we should review this question "for correctness," but Keystone contends that we review the question for "patent error or clear abuse of discretion." (Quotation simplified.) As explained below, however, we need not decide which standard of review applies here because the standard of review does not prove to be outcome determinative.

ANALYSIS

I. Premature Termination Claims

¶51     In the Premature Termination Claims, Airstar asserted that Keystone breached both the Hangar 16 Sublease and the implied covenant of good faith and fair dealing when it agreed to Amendment 7 (which, again, caused the premature termination of the Hangar 16 Sublease). The district court dismissed both claims, and Airstar now challenges both rulings.

A.     Breach of the Hangar 16 Sublease

¶52     Airstar first argues that Keystone breached the Hangar 16 Sublease by agreeing to Amendment 7. We disagree.

¶53     "When we interpret a contract, we start with its plain language." *Willow Creek Assocs. of Grantsville LLC v. Hy Barr Inc.*, 2021 UT App 116, ¶ 41, 501 P.3d 1179 (quotation simplified). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (quotation simplified). Our interpretation "is guided by the ordinary and usual meaning of the words," and "we often look to standard, non-legal dictionaries" for assistance. *Willow Creek*, 2021 UT App 116, ¶ 42 (quotation simplified).

¶54     Here, the Hangar 16 Sublease included the Termination Clause. In the Termination Clause, Airstar agreed that if the 1992 FBO Agreement "terminated for any reason" and Keystone was "required to give up possession of the Premises as a result," the Hangar 16 Sublease would "terminate" too. As recognized by the district court, this was a broadly worded clause. "Any" ordinarily

means "one or some indiscriminately of whatever kind."[10] And the phrase "as a result" means "because of something," which connotes a cause-and-effect relationship.[11] So when Keystone reached an agreement with Salt Lake City that prematurely terminated the 1992 FBO Agreement, this accordingly qualified as a termination "for any reason" for which Keystone was "required to give up possession of the Premises" "as a result." Because of this, the Hangar 16 Sublease terminated with the 1992 FBO Agreement.

¶55 Airstar nevertheless focuses on the language from the Termination Clause stating that Keystone must have been "*required* to give up possession of the Premises as a result." (Emphasis added.) In Airstar's view, the word "required" refers to something that is involuntary. Airstar thus contends that Keystone's agreement to Amendment 7 (and, in particular, the amendment's language that caused the premature termination of the 1992 FBO Agreement) was "unjustified" because this agreement "was a choice, not a requirement." According to Airstar, this constituted a breach of the Hangar 16 Sublease because "[i]n no sense can it be said here that Keystone was forced to agree to the termination of the FBO Agreement."

¶56 We disagree with Airstar's interpretation. Again, on its face, the Termination Clause was operative if Keystone's right to the property was "terminated for *any* reason," and "any" is an inclusive term. (Emphasis added.) If the parties had intended for the Termination Clause to apply only if Keystone *involuntarily* terminated the 1992 FBO Agreement, they could have said so. But they didn't—there is nothing in the Hangar 16 Sublease prohibiting Keystone from voluntarily terminating the 1992 FBO

---

10. *Any*, Merriam-Webster, https://www.merriam-webster.com/dictionary/any [https://perma.cc/UF4F-TVMP].

11. *As a result*, Merriam-Webster, https://www.merriam-webster.com/dictionary/as%20a%20result [https://perma.cc/Z95F-YKM7].

Agreement. We therefore see no support in the sublease's plain language for the limitation suggested by Airstar.

¶57 Our conclusion that the Termination Clause covered both voluntary and involuntary terminations is also supported by the parties' inclusion of two exceptions within that same clause: namely, the parties agreed that the Hangar 16 Sublease would not terminate if the 1992 FBO Agreement was terminated because of either "eminent domain" or "a failure of Keystone to timely perform its obligations." This demonstrated the parties' recognition that some exceptions would apply, and, importantly, it also demonstrated their ability to negotiate for any desired exceptions. If Airstar had wanted to bargain for a prohibition on voluntary termination by Keystone, it could have done so. But because it didn't (or, perhaps, tried to but was unsuccessful and still entered the agreement anyway), we decline to read such language into the contract now. *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179 ("We will not make a better contract for the parties than they have made for themselves.").

B. Breach of the Implied Covenant

¶58 Airstar next claims that even if Keystone didn't breach the Hangar 16 Sublease by agreeing to the premature termination, Keystone violated the implied covenant of good faith and fair dealing by doing so. We again disagree.

¶59 "[T]he parties to a contract cannot feasibly anticipate all possible contingencies nor reasonably resolve how they would address them in writing." *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 8, 266 P.3d 814. Given this, Utah courts have "recognized an implied duty that contracting parties refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Id.* ¶ 9 (quotation simplified). This implied duty is commonly referred to as the implied covenant of good faith and fair dealing. *See id.*

¶60 Although "a covenant of good faith and fair dealing inheres in almost every contract, some general principles limit the scope of the covenant." *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226. Importantly, "this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante." *Id.* Nor can this covenant "create rights and duties inconsistent with express contractual terms." *Id.* In one prior case, for example, we held that the "implied covenant of good faith and fair dealing cannot inject a term of years into the contract when the parties expressly agreed to an at-will relationship terminable at any time." *Anderson v. Larry H. Miller Commc'ns Corp.*, 2012 UT App 196, ¶ 18, 284 P.3d 674.

¶61 As explained above, Airstar agreed that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement "terminated for any reason" and Keystone was "required to give up possession of the Premises as a result." But Airstar now argues that the implied covenant affirmatively prevents Keystone from voluntarily terminating the 1992 FBO Agreement. If this were true, however, then Keystone would not be able to terminate the 1992 FBO Agreement "for any reason." Rather, Keystone would only be able to involuntarily terminate the 1992 FBO Agreement. In this sense, Airstar asks us to use the implied covenant as a means of "establish[ing] new, independent rights or duties to which the parties did not agree ex ante." *Oakwood Village*, 2004 UT 101, ¶ 45.

¶62 Although this would be a new restriction, Airstar argues that this would be appropriate under the implied covenant because, in its view, Keystone's decision to agree to the premature termination was "inconsistent[] with the parties' common purpose and justified expectations under the Hangar 16 Sublease."

¶63 But Airstar has not pointed to any contractual terms showing that "the parties' common purpose and justified expectations" actually prohibited Keystone from prematurely

terminating the Hangar 16 Sublease. To the apparent contrary, the contract's terms recognized the possibility of termination "for any reason," so the contract itself appears to have contemplated the possibility of such termination.

¶64    Moreover, the parties here were sophisticated entities who negotiated a sublease for hangar space. From the face of the sublease, Keystone's apparent purpose was to lease the space so that it could make a profit, while Airstar's purpose was to gain access to the space for its own use. When Keystone's business interests later caused it to agree to the premature termination, this decision was consistent with its own purposes but inconsistent with Airstar's. We see nothing in the language of the Hangar 16 Sublease itself that would have made this decision inconsistent with any *common* purpose for that agreement.

¶65    In any event, we disagree with Airstar's suggestion that the parties' "common purpose and justified expectations" can trump the express terms of a contract. As explained by our supreme court, courts will "not use [the implied] covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract." *Oakwood Village*, 2004 UT 101, ¶ 45. Put differently, "[w]here the parties themselves have agreed to terms that address the circumstance that gave rise to their dispute," a "court has no business injecting its own sense of what amounts to 'fair dealing.'" *Young Living*, 2011 UT 64, ¶ 10. Here, because the express terms of the Hangar 16 Sublease "address[ed] the circumstances that gave rise to [this] dispute," we will not apply the implied covenant to reach an outcome that differs from what the Hangar 16 Sublease dictates. *Id.*

¶66    In short, if Airstar had wanted to limit Keystone's ability to prematurely terminate the 1992 FBO Agreement, it could have negotiated for such a limitation in the Hangar 16 Sublease. It didn't, so we agree with the district court that the implied covenant cannot be used to create such a limitation now. We therefore conclude that the district court did not err when it

granted Keystone's request for judgment on the pleadings on the breach of the implied covenant claim that was based on premature termination.

## II. Third-Party Beneficiary Claims and Waiver

¶67   In its amended complaint, Airstar argued that it was a third-party beneficiary of the 1992 FBO Agreement because it was "a subtenant under the [1992] FBO Agreement." Airstar then alleged breach of contract and breach of the implied covenant claims against Keystone and Salt Lake City, arguing that they had "breached their obligations to Airstar as a third party beneficiary" by modifying the 1992 FBO Agreement. After Keystone and Salt Lake City filed motions to dismiss, the district court agreed that Airstar "was an intended third party beneficiary of the [1992] FBO Agreement." But the court also determined that Airstar waived its third-party rights when it signed the Hangar 16 Sublease, which, again, provided that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement terminated. Airstar challenges that ruling on appeal.

¶68   As an initial matter, we agree with the district court that Airstar was a third-party beneficiary of the 1992 FBO Agreement. "Third-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 47, 28 P.3d 669 (quotation simplified). "For a third party to have enforceable rights under a contract, the intention of the contracting parties to confer a *separate and distinct benefit* upon the third party must be clear." *Id.* (quotation simplified, emphasis in original). Here, the 1992 FBO Agreement specifically identifies third parties—it refers to them as "subtenants"—and it then gives them an enforceable right of attornment. Airstar was a subtenant, so we agree that it was a third-party beneficiary of the 1992 FBO Agreement.

¶69    This accordingly leaves the question of whether the district court correctly ruled that Airstar waived its third-party beneficiary rights. On this, we agree with the district court.

¶70    "Waiver is the intentional relinquishment of a known right." *Pioneer Builders Co. of Nevada v. K D A Corp.*, 2018 UT App 206, ¶ 14, 437 P.3d 539 (quotation simplified). "For waiver to occur, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Id.* (quotation simplified). "The intent to relinquish a right must be distinct, although it may be express or implied." *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 62, 289 P.3d 369 (quotation simplified).

¶71    As a third-party beneficiary, Airstar had "an existing right." *Id.* ¶ 61 (quotation simplified). That right allowed Airstar to attorn to Salt Lake City if the 1992 FBO Agreement terminated. By doing so, it could keep its sublease under the same "terms and conditions." Airstar has not contested that this was a "known right." *Id.* (quotation simplified). Indeed, it could not plausibly make that argument, because the Hangar 16 Sublease explicitly references the 1992 FBO Agreement—which, again, is the source of the attornment rights in question.

¶72    Our waiver analysis thus turns on whether Airstar had the "intention to relinquish" its attornment rights. *Id.* (quotation simplified). We conclude that it did.

¶73    Airstar's attornment rights, as provided in the 1992 FBO Agreement, were predicated on there being an existing sublease. But the Termination Clause provided that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement "terminated for any reason" other than the two enumerated exceptions. So if the 1992 FBO Agreement terminated, the Hangar 16 Sublease would terminate as well, and there would be no basis for attornment. By signing the Hangar 16 Sublease, Airstar therefore intentionally agreed to relinquish its attornment rights if the 1992 FBO Agreement was terminated "for any reason" other than the two enumerated reasons. *See Pioneer Builders*, 2018 UT App 206, ¶ 14.

We accordingly agree with the district court that this constituted waiver.[12]

¶74   Airstar pushes back, however, contending that its "third-party beneficiary rights under the FBO Agreement could not be modified without Airstar's consent, since Airstar's rights had vested." But Airstar's third-party beneficiary rights were not "modified without Airstar's consent." Rather, as explained, Airstar intentionally relinquished its attornment rights when it entered into the Hangar 16 Sublease.

¶75   Airstar further argues that the Termination Clause is consistent with its third-party rights, and not a waiver of them, because the clause "was included in the Hangar 16 Sublease to protect Keystone from liability to Airstar in the event that the FBO Agreement terminated for reasons beyond Keystone's control." But the phrase "for reasons beyond Keystone's control" is not anywhere in the Termination Clause, and it also contradicts the parties' agreement that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement "terminated for any reason."

¶76   In sum, the district court did not err in dismissing Airstar's third-party beneficiary claims for breach of contract and breach of the implied covenant.

### III. Notice Claims and Proximate Cause

¶77   The Termination Clause required Keystone to provide "as much notice as possible of any situation which may result in termination of the FBO Agreement." In the Notice Claims, Airstar alleged that Keystone breached this clause by failing to timely inform it of Keystone's negotiations with Salt Lake City about a possible premature termination of the 1992 FBO Agreement. But

---

12. Airstar's original sublease (the Hudson Sublease) did not include an equivalent to the Termination Clause. So under Airstar's original sublease, this particular roadblock to attornment would not have existed.

the district court later granted summary judgment in favor of Keystone on these claims based on Airstar's failure to "present any non-speculative evidence" showing that, had Airstar "been apprised of the lease swap negotiations at an earlier date, [Airstar] could have ensured that the rent and associated costs of renting the hangar space would not increase following the expiration of the FBO Agreement."

¶78    Airstar challenges this ruling on appeal, arguing that it "presented the district court with ample evidence" to show "that a genuine dispute as to material fact existed" about this. We disagree.

A.    Summary Judgment Standard

¶79    A party is entitled to summary judgment if "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). When a district court considers a motion for summary judgment, "it is required to draw all *reasonable* inferences in favor of the nonmoving party." *IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588 (emphasis in original). But the court "is not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party." *Id.*

¶80    Moreover, the "moving party's burden varies depending on who bears the burden of persuasion at trial." *Salo v. Tyler*, 2018 UT 7, ¶ 26, 417 P.3d 581. For example, "a movant who seeks summary judgment on a claim on which the nonmoving party bears the burden of persuasion may show that there is no genuine issue of material fact without producing its own evidence." *Id.* And such a movant can establish that there is no genuine issue of material fact by showing that the nonmoving party "has no evidence of essential elements of [its] claims." *Id.* ¶ 33.

¶81    Proximate cause is an essential element of both breach of contract and breach of the implied covenant. *See Christensen & Jensen, PC v. Barrett & Daines*, 2008 UT 64, ¶ 26, 194 P.3d 931.

"Proximate cause is defined as that cause which, in natural and continuous sequence (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred." *Francis v. National DME*, 2015 UT App 119, ¶ 49, 350 P.3d 615 (quotation simplified). In this case, the proximate cause element therefore required Airstar to establish that, absent Keystone's tardy notice, "the injury"—meaning, here, its claimed damages—would not have occurred. *See id.*

¶82　Proximate cause typically presents "a question of fact for the jury." *Rose v. Provo City*, 2003 UT App 77, ¶ 10, 67 P.3d 1017. And "if there is any doubt about whether something was a proximate cause of the plaintiff's injuries, the court must not decide the issue as a matter of law." *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 12, 104 P.3d 1185.

¶83　But "summary judgment may be granted on proximate cause in appropriate circumstances." *Thurston v. Workers Comp. Fund*, 2003 UT App 438, ¶ 16, 83 P.3d 391. One such circumstance is "when the proximate cause of an injury is left to speculation so that the claim fails as a matter of law." *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996). It is thus "appropriate" for a district court to grant summary judgment based on a failure to show proximate cause "if there is no evidence that establishes a direct causal connection between" the alleged breach and the alleged injury. *Thurston*, 2003 UT App 438, ¶ 16 (quotation simplified).

B.　Application

¶84　Airstar argues that summary judgment was inappropriate because the Administration Director provided testimony that "would allow a jury to reasonably conclude that Keystone's untimely notice proximately caused Airstar's damages." Airstar relies on this exchange from the Administration Director's deposition as support for its argument that it provided evidence of proximate cause:

[Airstar's Counsel] And so the question I put to you was, if you had been aware that the Airstar lease had a term continuing until 2021, would your approach to the lease swap proposal have been any different?

. . . .

[Administration Director] I presume had we known, we would have made it the obligation of -- or condition on a swap that Keystone make accommodations for any of its tenants that have leases that might have extended beyond the term of these buildings.

[Airstar's Counsel] What kind of accommodations?

. . . .

[Administration Director] We might have -- we would -- I don't know that we would have suggested a specific accommodation, but typically, you know, our approach -- I wouldn't say typically. Our approach would likely have led to, as part of the negotiation, making certain that Keystone not create the dilemma that they ultimately found themselves in, and that they make whatever accommodations, whether financial accommodations or other space accommodations or some other accommodations, with any other tenants that have prevailing terms that went beyond.

¶85   We agree with Airstar that, as a general proposition, even a single sworn statement can create a genuine issue of material fact. *See, e.g.*, *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292 (Utah Ct. App. 1996). But while we "draw all *reasonable* inferences in favor of" Airstar, *IHC Health Services*, 2008 UT 73, ¶ 19

(emphasis in original), Airstar still cannot defend itself against summary judgment with "pure speculation," *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 21, 390 P.3d 314.

¶86 Here, the Administration Director's testimony did not establish a "direct causal connection" between Keystone's alleged failure to provide timely notice and Airstar's claimed damages. *Thurston*, 2003 UT App 438, ¶ 16 (quotation simplified). In its amended complaint, Airstar identified its damages as: (1) the cost of resurfacing the hangar's floor; (2) the "substantially higher" cost of rent and fuel that it had to pay under its subsequent sublease with Atlantic Aviation; and (3) the cost of mitigating those damages, including attorney fees.

¶87 The Administration Director's testimony did not establish that any of these would have been avoided if Keystone had provided timely notice. To the contrary, while the Administration Director surmised that Salt Lake City might have asked Keystone to "make accommodations," he also stated that he didn't know if Salt Lake City "would have suggested a specific accommodation." Instead, he suggested that Salt Lake City's "approach would likely have led to . . . financial accommodations *or* other space accommodations *or* some other accommodations." (Emphases added.) The Administration Director's repeated use of the disjunctive "or" was significant because it demonstrated his unwillingness to say that Salt Lake City would actually have insisted on any particular accommodations.

¶88 This unwillingness was even more pronounced elsewhere in his deposition. For example, Airstar's counsel asked the Administration Director if it was "the City's understanding that whatever arrangements were made for Airstar, [Airstar] would be allowed to continue to occupy space at the airport under the same terms and conditions as their existing sublease." The Administration Director replied, "No." Similarly, the Administration Director was asked if Salt Lake City "care[d] if Keystone raised the rent for Airstar." The Administration Director responded, "That level of tenant-subtenant relationship was not

part of our negotiations or calculations." And when the Administration Director was asked if Salt Lake City "involve[d] [itself] in the details of what the sublease terms were," the Administration Director explained, "It has . . . always been our practice not to interfere in those business arrangements . . . . [W]e do not involve ourselves in those lease matters. It would not be appropriate, largely."[13]

¶89 Again, when reviewing a summary judgment motion, a court is required to draw only "*reasonable* inferences." *IHC Health Services*, 2008 UT 73, ¶ 19 (emphasis in original). Here, even accepting what the Administration Director said as true, his testimony established, at most, that Salt Lake City "would likely" have required Keystone to accommodate Airstar in some unspecified way. But he never said that Salt Lake City would have insisted on any particular accommodations that would have prevented the particular damages that Airstar asserted in its amended complaint.[14]

---

13. The Airport Director was even more direct about this in her deposition. There, Keystone's counsel asked, "With respect to negotiations between the airport and FBOs, do you believe that the airport should have concerned itself, in those negotiations, with the terms of subleases?" The Airport Director responded, "No."

14. It's at least arguable that the cost of resurfacing the hangar's floor stands on a different footing than the other sources of claimed damage. As noted, there was some evidence of how much that resurfacing cost, and we see it as something of a close call as to whether a jury could have drawn an inference that if Airstar had been given earlier notice of Keystone's negotiations with Salt Lake City, Airstar might not have chosen to incur that expense.

But even if this were so, we would still affirm the grant of summary judgment as to this source of damage, albeit on a different ground. As noted, Airstar ultimately negotiated a new

(continued…)

¶90 We accordingly agree with the district court that Airstar has provided no non-speculative evidence that established a "direct causal connection" between Keystone's alleged breach and Airstar's claimed damages. *Thurston*, 2003 UT App 438, ¶ 16 (quotation simplified). And because there was no genuine issue of material fact on this essential element of Airstar's claim, Keystone was "entitled to judgment as a matter of law." Utah R. Civ. P. 56(a).

## IV. Attorney Fees

¶91 After the district court granted summary judgment in Keystone's favor, Keystone requested attorney fees. In its fee calculation, Keystone requested an award for fees that it incurred while litigating claims based on both the 1992 FBO Agreement and the Hangar 16 Sublease. The court granted that request, finding that "the noncompensable claims—those related to Salt Lake City Corporation, Atlantic Aviation and the FBO Agreement—are inextricably intertwined with the compensable claims asserted in this action."

¶92 Airstar, however, argues that "Keystone should not be awarded attorneys' fees for defending against claims Airstar made under the FBO Agreement since the FBO Agreement does not contain an attorneys' fees provision" and that the "district court erred by conflating all claims in this matter as 'inextricably intertwined.'"

A. Standard of Review

¶93 Before addressing the merits of Airstar's argument, we first briefly note a dispute about the appropriate standard of review.

---

lease with Atlantic Aviation that allowed Airstar to still occupy and use Hangar 16, rather than moving to a different hangar. Indeed, because of this new agreement, Airstar is still enjoying the benefits of that resurfacing. It therefore cannot show that it was damaged in this particular respect by any lack of notice.

Airstar points to cases holding that "whether attorneys' fees are recoverable in an action is a question of law, which this Court reviews for correctness." *See, e.g., Utah Telecomm. Open Infrastructure Agency v. Hogan*, 2013 UT App 8, ¶ 10, 294 P.3d 645. Airstar accordingly asks us to give no deference to the district court's award of attorney fees. Keystone, however, points to cases that, in its view, suggest that a "district court's finding that compensable claims overlapped significantly with non-compensable claims . . . is reviewed for 'patent error or clear abuse of discretion.'" (Citing *Stevensen 3rd East, LC v. Watts*, 2009 UT App 137, ¶¶ 27, 61, 210 P.3d 977.)

¶94    We need not resolve this dispute here, however, because, even applying the non-deferential standard of review, we still affirm the district court's decision.

B.    Airstar's Claims

¶95    "In Utah, attorney fees are awardable only if authorized by statute or by contract. If provided for by contract, the award of attorney fees is allowed only in accordance with the terms of the contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988) (quotation simplified); *see also Innerlight, Inc. v. Matrix Group, LLC*, 2012 UT App 251, ¶ 7, 286 P.3d 945.

¶96    But "when a dispute involves multiple claims involving a common core of facts and related legal theories, and a party prevails on at least some of its claims, it is entitled to compensation for all attorney fees reasonably incurred in the litigation." *KB Squared LLC v. Memorial Bldg. LLC*, 2019 UT App 61, ¶ 34, 442 P.3d 1168 (quotation simplified). Put differently, if a compensable claim is "inextricably intertwined" with a noncompensable claim, fees related to the noncompensable claim are "appropriately included in the fee calculation." *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 35, 241 P.3d 375.

¶97    In the Hangar 16 Sublease, Keystone and Airstar agreed as follows:

> In the event of the bringing of any action or suit by either party hereto by reason of any breach of any of the covenants or agreements on the part of the other party *arising out of this Lease*, then in that event the prevailing party shall be entitled to have and recover of and from the other party costs and expenses of the action or suit, including reasonable attorneys' fees.

(Emphasis added.)

¶98   Airstar concedes that Keystone's fees incurred while defending against claims based on the Hangar 16 Sublease are recoverable. But it argues that its claims based on the 1992 FBO Agreement did not "arise under" the Hangar 16 Sublease and thus fees incurred in litigating those claims are not recoverable. We disagree.

¶99   In its amended complaint, Airstar alleged that by entering into the Hangar 16 Sublease, it became a third-party beneficiary of the 1992 FBO Agreement. It then asserted that Keystone and Salt Lake City breached the 1992 FBO Agreement and its implied covenant by prematurely terminating the 1992 FBO Agreement. As explained above, however, Keystone successfully defended against this claim by arguing that Airstar waived its third-party beneficiary rights by entering into the Hangar 16 Sublease.

¶100  So in order to resolve Airstar's third-party beneficiary claims against Keystone, the court necessarily had to interpret the Hangar 16 Sublease. In this sense, the claims based on the 1992 FBO Agreement and those based on the Hangar 16 Sublease both ultimately hinged on the terms of the Hangar 16 Sublease; and because of that, they all "involv[ed] a common core of facts and related legal theories" and were "inextricably intertwined." *Golden Meadows Props.*, 2010 UT App 257, ¶ 35 (quotation simplified); *see also KB Squared*, 2019 UT App 61, ¶ 34 (holding that multiple claims involved "a common core of facts and related

legal theories" when they all "related to the same issue of whether [a party] was required to 'repair' [a bridge] under the Lease").

¶101   We therefore agree with the district court that Airstar's claims based on the 1992 FBO Agreement were "inextricably intertwined" with its claims based on the Hangar 16 Sublease. As a result, Keystone was entitled to include work associated with the 1992 FBO Agreement claims in its fee calculation. *See Golden Meadows Props.*, 2010 UT App 257, ¶ 35.

C.    Attorney Fees on Appeal

¶102   Keystone has also requested attorney fees incurred on appeal. "When a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (quotation simplified). We accordingly award Keystone its fees reasonably incurred on appeal and remand for the district court to calculate that award.

CONCLUSION

¶103   Because the parties agreed that the Hangar 16 Sublease would terminate if the 1992 FBO Agreement "terminated for any reason," the district court did not err in dismissing Airstar's Premature Termination Claims. Nor did the court err in ruling that Airstar waived its third-party beneficiary rights. The court also did not err when it concluded that Airstar had presented only speculative evidence of proximate cause and granted summary judgment in Keystone's favor. Finally, the court did not err in ruling, for purposes of evaluating Keystone's claim to attorney fees, that Airstar's compensable and noncompensable claims were "inextricably intertwined."

¶104   We therefore affirm the district court's rulings, and we also remand for a determination of attorney fees reasonably incurred on appeal.

———————